# Richmond

## H. M. Trayer and D. and J. Corporation v. Bristol Parking, Incorporated.

November 26, 1956.

Record No. 4587.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Donald T. Stant (Bradley Roberts; Stant & Roberts,* on brief), for the appellants.

*William H. Woodward (S. Bruce Jones; Waldo G. Miles; Jones, Woodward & Miles,* on brief), for the appellee.

SPRATLEY, J., delivered the opinion of the court.

Bristol Parking, Incorporated, filed its bill in equity against H. M. Trayer and D. and J. Corporation and G. W. Reed, Jr., Trustee, praying the court to order and direct that Trayer and D. and J. Corporation convey to the complainant certain described real estate upon payment of the purchase price for which the property had been conveyed to D. and J. Corporation. The bill alleged, in substance, that Trayer, a director of complainant, with knowledge that complainant desired to acquire the property in the conduct of its business, and had commissioned him to negotiate the purchase for it, violated the trust and confidence reposed in him as a director, purchased the property for himself, and had its owner convey to D. and J. Corporation, a corporation wholly owned by Trayer and that such action by Trayer was a breach of faith amounting to fraud, and he and his corporation therefore held the title in constructive trust for the benefit of complainant.

Trayer filed a demurrer and answer. His answer denied the material allegations of the bill, and averred that complainant had "acquiesced" in the purchase by him for his own benefit, and was thereby "estopped" to claim the property. G. W. Reed, Jr., Trustee, answered, alleging that his sole interest in the suit was to protect the lien of a deed of trust upon the property executed by D. and J. Corporation to secure notes evidencing a part of the purchase money to be paid to the vendor of the property.

The evidence was heard *ore tenus* before the trial court, a large amount of testimony being presented.

On November 10, 1955, the court entered a decree holding, in part, as follows:

"It appearing from the pleadings and proof in this cause that the defendant, H. M. Trayer, purchased certain real estate in the City of Bristol, Virginia, as mentioned and described in the bill of com-

plainant and proceedings, in violation of a fiduciary duty owed to complainant by him as a director of the complainant corporation and by reason of his specific undertaking; and it further appearing that complainant has not acquiesced in said purchase and is not estopped or otherwise barred from contesting the said purchase by defendant Trayer and that defendant Trayer has caused the title to said property to be conveyed by deed to the defendant D. & J. Corporation, which corporation is owned and controlled by said Trayer; the demurrer of D. & J. Corporation and H. M. Trayer is accordingly overruled, and the Court does hereby find, adjudge and decree that said D. & J. Corporation holds title, subject to the lien hereinafter mentioned in constructive trust for complainant Bristol Parking, Incorporated, and that complainant, upon payment to said D. & J. Corporation and H. M. Trayer of all sums expended by said D. & J. Corporation and said Trayer on the purchase price of said property, * * *," in accordance with the terms of the decree, D. and J. Corporation should make, execute and deliver a deed conveying the property to complainant.

For the purpose of brevity, the parties to the suit will be hereinafter sometimes designated as follows: H. M. Trayer as Trayer, D. and J. Corporation as D. and J., and Bristol Parking, Incorporated, as Parking.

Trayer and D. and J. complain of the decree against them on two grounds: (1) that Trayer had the right to purchase the property for himself and that no constructive trust arose; and (2) that if Parking was ever entitled to have the property charged with the constructive trust, and conveyed to it, it was estopped to exercise such right by its acquiescence in the purchase by Trayer for himself.

The evidence before the trial judge on questions of fact is entitled to great weight, and will not be disturbed unless it is plainly wrong or without evidence to support it. § 8-491, Code of Virginia, 1950. Where the conclusion depends on the weight to be given credible testimony, the decree based thereon has the same effect as the verdict of a jury, and the decree will be affirmed, although there may be a conflict in the evidence. *Worrie* v. *Boze*, 191 Va. 916, 923, 62 S. E. 2d 876; 1 M. J., Appeal and Error, sections 271, 273, 277 and 278, and cases cited.

In view of the foregoing principle, the evidence should be stated in the light most favorable to appellee, in whose favor the decree was entered. However, testimony upon which appellants rely

in support of their contention that Parking "acquiesced" in the sale of the lot to him for his own benefit will be also stated.

Parking is a corporation organized by Bristol merchants to provide parking facilities in down-town Bristol. It owns two parking lots and leases two. In November, 1954, a building known as the Twin City Market Building, on a lot in the southwest corner of Moore and Cumberland Streets, in Bristol, Virginia, was destroyed by fire. Shortly thereafter, H. K. Buchanan, David B. Weinstein and G. R. Burroughs, directors of Parking, and members of its executive committee, began to investigate the adaptability of this lot, hereinafter referred to as the Market lot, for parking cars, and the possibility of Parking acquiring it by lease or purchase. They were discussing the matter in Burroughs' office on or about the 1st of December, 1954, when Trayer, a stockholder in Parking, telephoned Burroughs, Parking's General Manager, and asked Burroughs if Parking was interested in acquiring the lot. Burroughs told him that it was interested. Trayer then said that he knew the owners of the lot, had rented from them, and thought he could be of assistance in obtaining a price for the property from the owners. After thanking him, Burroughs further advised him that the matter would be discussed at the annual meeting of Parking's stockholders on December 7, 1954.

Buchanan heard that Glenn E. Minnick, a real estate broker, had the property in charge as agent for the owner. At the request of Buchanan, Minnick met with the executive committee of Parking about December 20, 1954. Minnick told the Committee that the stockholders of the Corporation which owned the lot had not determined whether to sell the stock of their corporation, or to dissolve it and sell the land for the benefit of the stockholders "separately." The members of the executive committee told Minnick that since they did not have authority to buy or lease for Parking, they would like to take an option in their names as agents for Parking, and that if the latter did not exercise the option, the three of them would buy the property themselves. Minnick said he would advise them of any development.

Trayer was present at the annual meeting held on December 7, 1954. Of the thirteen stockholders present, eleven testified and ten of them stated, in substance, that the acquisition of the lot by Parking was discussed; that in response to a question, Trayer stated that he was not interested in acquiring the property for himself; and that he, Trayer, knew the owners of the lot, and believed he could get from

them a satisfactory price, and would convey that information to Parking. Trayer was authorized to do so; but not to reveal that Parking was interested. He was simply to obtain the lowest price for which the property could be sold, and report to Parking what that price was.

The minutes of the annual meeting show that Buchanan reported that the lot might possibly be purchased at the price of $75,000 or less, and contained the recital: "During a general discussion it appeared to be the opinion of most of the stockholders present that the possibility of acquiring the use of this property was sufficiently attractive to warrant further investigation, and Mr. Clark suggested the possibility of entering into a lease with an option to buy the property." Weinstein, President of Parking, testified that he requested Trayer to report to the executive committee whatever information he obtained. Weinstein also asked Buchanan, another director, to find out what he could do about getting a low price for the lot and to look into the cost of the development of the property to put it in shape for parking cars.

At this meeting, Trayer was elected a director, and he attended the directors' meeting which immediately followed the stockholders' meeting. The minutes of this meeting contained no reference to the possible acquisition of the property.

At the request of Trayer, Buchanan and Burroughs met with Trayer on or about the 10th or 12th of January, 1955, at Trayer's restaurant. Trayer told them that some persons from Johnson City were definitely interested in the Market lot, and that they had been in his restaurant that day. Buchanan then inquired whether Trayer would sell Parking a lot owned by Trayer, sometimes referred to as the Morley lot, adjacent to the Market property, in order that Parking might have a larger area if they were successful in acquiring the Market property. Trayer replied that his property was not for sale, and again stated that he was not interested in acquiring the Market property for himself.

On January 18th, Minnick brought Mrs. Whittington, the principal stockholder in the corporation which owned the Market property, and her attorney, G. W. Reed, Jr., to see Buchanan. At this meeting, $50,000 was set as the sale price, and the terms of payment were agreed upon. Mrs. Whittington, however, said that the corporation owning the property was still not in a position to give Parking an option until a decision had been reached regarding a

dissolution of the corporation. Burroughs and Weinstein were not present at this conference; but they were advised of what took place.

Several days later, Minnick called Buchanan and told him that it had been decided to dissolve the corporation owning the Market lot, and that its sale price might be all cash. Buchanan told him that this would be satisfactory. In reply to a subsequent inquiry by Weinstein, Minnick said that he had heard nothing from his principals, but was confident that Parking was to have the refusal of the property. A deposit was offered on the purchase price but not accepted by Minnick.

On January 29, 1955, Minnick told Trayer that the owner of the Market lot had decided to sell it for $50,000. That day the two inspected the wall of the Market Building, in which Trayer had a joint interest, and which was then being torn down. On February 4th, Trayer and Minnick went to Roanoke, Virginia, and there met one of the principal stockholders of the corporate owner of the Market lot in the office of Attorney Reed. There a verbal agreement was made to sell the property to Trayer. Following this, a form of a written contract of sale, naming Trayer's attorney as the purchaser, dated March 1, 1955, was sent to Minnick. On February 12th, Minnick and Trayer, after a consultation with Trayer's attorney, decided that title to the property should be taken in the name of a corporation, to be later organized as D. and J. Corporation. On February 14th, Trayer and Minnick went to Roanoke again. The terms of sale were agreed upon, and on or about March 1st, a signed contract of sale to D. and J. was delivered to Trayer, and Trayer made a deposit of $1,000 on the purchase price.

During the above negotiations, Trayer did not mention Parking or its desire to acquire the property, nor did he advise his attorney that he was a director of Parking until some time after the contract of purchase had been agreed upon.

On April 6th, a few days before the delivery of a deed for the lot to D. and J., Weinstein went to Trayer's restaurant as a customer. While there, he inquired of Trayer what the latter had heard about the property, and Trayer told him he had heard nothing, although at that time the contract of sale to D. and J. had been executed and delivered. On April 12th, in a room of the local Chamber of Commerce, Burroughs said to Trayer that he had heard that the Market lot had been sold, and that Parking would not be able to do what they wanted with reference to it. Trayer replied that Parking needed

but one parking lot at the southwest corner of Moore and Cumberland Streets in Bristol.

On April 15th, Trayer, after recording the deed conveying the property to D. and J., requested a meeting with Buchanan. They met at Trayer's restaurant, and Trayer told Buchanan that D. and J. had purchased the lot, and that he, Trayer, was the D. and J. Corporation. Buchanan expressed surprise at such action on the part of a business-man. Trayer said that he owned adjoining property, and thought he should also own the Market property. When Buchanan asked Trayer why the latter had not discussed the matter with him before, Trayer then proposed that he lease to Parking not only the Market property but also his adjoining property at a reasonable price, stating that Jim Dougherty, a real estate man, would handle the negotiations for him. Buchanan told Trayer that Weinstein and Burroughs were very bitter about the matter. Thereafter negotiations for the lease were entered into between the officers of Parking and Trayer and Dougherty. On May 27, 1955, at a directors' meeting of Parking, the terms of its proposed lease were discussed, and the officers of the Corporation authorized to enter into a ten-year lease of the lot and adjoining property belonging to Trayer at a monthly rental of $385, plus payment of the property taxes. A lease prepared by Trayer's attorney was presented; but it contained so many items objected to by Parking, that the latter's attorney was requested to prepare a lease to submit to Trayer, and this was done on June 14th.

One of the chief objections to the lease prepared by Trayer's attorney was that Trayer insisted upon the reservation of one square foot at the corner of Moore and Cumberland Streets, on which to erect a sign pointing to his restaurant, located less than one-half block north and on Moore Street. Parking refused to agree to this on the ground that it would have allowed one stockholder merchant a preferential privilege over the other stockholders.

It does not appear that any effort was made by either of the parties to come to an agreement upon the proposed lease subsequent to June 30th. Trayer said that on July 1st, he and Dougherty began negotiations to lease the Market and Morley lots to other tenants. They did not advise Parking of such negotiations.

On July 13th, Trayer, individually, and Bradley Roberts, President of D. and J., entered into an executory agreement with R. G. Barnhill and J. K. Daniel, to lease the Market and Morley lots to a motel corporation to be organized. Following this, Trayer said he

tore down the building on his Morley lot, in order to make both of the properties available to the motel corporation. Thereafter notice of the construction of the proposed motel was broadcast by radio, and an architect was employed to look into and furnish plans for the motel. At the time of the institution of the suit, the motel corporation had not been chartered, and consequently no interest in the property had been transferred to it.

On July 22nd, a newspaper notice of the proposed motel appeared, and this was brought to the attention of Parking's President, Weinstein. He called a meeting of the directors of his Corporation for July 26th, the stated purpose being "to consider appropriate action by the Executive Committee with reference to the lot on the southwest corner of Moore and Cumberland Streets."

On July 25th, Trayer wrote to Weinstein, advising him of his inability to attend the meeting. This letter was read at the meeting on July 26th, and eight of the eleven directors were present. President Weinstein reported the lease as prepard by attorneys for D. and J. and Trayer as being unsatisfactory to Parking, and that the one prepared by its attorney was not satisfactory to Trayer. The attorney for Parking advised the directors as to the law applicable; that he had prepared a bill to compel the conveyance of the Market lot to Parking; and told them it was their duty to determine whether the matter should be dropped, or legal action should be taken. There was a prolonged discussion, no decision was reached, and the meeting was adjourned to the following day. At the adjourned meeting, on July 27th, seven directors were present, and also W. H. Woodward, attorney for Parking. A bill to compel the sale of the property to Parking was read and its purposes explained.

The minutes of that meeting recite that at the conclusion of a discussion of the advantages and disadvantages of taking legal action, President Weinstein "inquired of the directors separately" for an expression of opinion as to whether they were in favor of filing the proposed bill. In response, two answered in the affirmative and five in the negative. However, no motion or resolution was offered or adopted, and there was no formal action taken by the Board. Neither Trayer nor Burroughs was present at this meeting, both being absent from the city.

On July 29th, Trayer returned from Richmond, and unofficially heard of the Board's action. He testified that he and his associate

thereupon continued with their plans to lease to the proposed motel corporation.

On or about August 1st, Burroughs, General Manager of Parking, returned to Bristol, Virginia, from an out-of-state visit, and was advised of the happenings at the directors' meeting on July 27th. After conferring with a number of directors and stockholders, he immediately gave notice to all directors and stockholders that a special meeting of the Board would be held on August 9th, for the purpose of reviewing the situation regarding the Market lot and deciding whether or not legal action should be taken to compel the conveyance of that lot to Parking.

Trayer said that he asked that this meeting be held at a later date, because he could not be present on August 9th. The meeting was held on that date, at which eight directors and six stockholders were present. Trayer did not attend, and a letter from him was read explaining why he could not be present. At this meeting, President Weinstein related the events leading up to the then existing situation with respect to the property. Various aspects of the problem were discussed and considered. Director McChesney moved that the attorney for Parking be authorized and instructed to file the bill which was read at the meeting of May 27th, requiring conveyance of the Market lot to Parking. The motion was seconded, and it was adopted by the affirmative vote of seven of the directors, the eighth director voting against it. On August 10th, this proceeding was instituted.

The evidence of the appellee which the chancellor accepted shows that Trayer, a director of Parking, with full knowledge that his corporation desired to acquire the Market lot in furtherance of its business purposes, and commissioned to negotiate for its purchase by the corporation, nevertheless, purchased the property for himself. It supports the holding of the trial court that such action on the part of Trayer was a breach of his fiduciary duty; and that he acquired the lot in constructive trust for Parking.

"The authorities are agreed that a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interest of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation * * *." *Rowland* v. *Kable*, 174 Va. 343, 366, 6 S. E. 2d 633.

In Fletcher's Cyclopedia, Corporations, Permanent Edition, Vol. 3, § 838, this is said:

"At common law, and by the modern current of authority in this country and in England, the directors of a private corporation, while not regarded as trustees in the strict, technical sense, are considered in equity as bearing a fiduciary relation to the corporation and its stockholders. In other words, it is universally recognized that courts of equity treat the relationship of director and stockholders as a trusteeship, in order to determine the rights, duties and liabilities of the directors."

See also to the same effect, Scott on Trusts, Vol. 3, § 499, page 2413, and Fletcher's Cyclopedia, Corporations, Permanent Edition, Vol. 3, § 861.1.

"It is well settled that where one person sustains a fiduciary relation to another he can not acquire an interest in the subject matter of the relationship adverse to such other party. If he does so equity will regard him as a constructive trustee and compel him to convey to his associate a proper interest in the property or to account to him for the profits derived therefrom." *Horne* v. *Holley*, 167 Va. 234, 240, 188 S. E. 169; *Byars* v. *Stone*, 186 Va. 518, 530, 42 S. E. 2d 847; *Jones* v. *Clary & Poythress*, 194 Va. 804, 805, 75 S. E. 2d 504.

The evidence and the answer of Trayer and D. and J. to complainant's bill show that D. and J. was a corporation organized by Trayer for the purpose of taking title to the property. It is admitted that Trayer was the sole owner of D. and J. Therefore, D. and J. is charged with knowledge of Trayer's breach of trust and its title is voidable for the same reasons that apply to Trayer.

Appellants' principal contention is that Parking, with knowledge of Trayer's purchase; with legal advice as to its rights; by its subsequent lease negotiations for the property; and its decision not to sue, "acquiesced" in Trayer's ownership and right to have conveyance made to D. and J.

In *County of Albemarle* v. *Massey*, 183 Va. 310, 315, 32 S. E. 2d 228, quoting from the case of *Taylor* v. *Cussen*, 90 Va. 40, 43, 17 S. E. 721, we said:

"Bigelow lays it down, on the authority of numerous adjudged cases, that the following elements must be present in order to an estoppel by conduct, viz: '(1) There must have been a false representation or concealment of a material fact; (2) the representation must have been made with knowledge of the facts; (3) the party to whom it was made must have been ignorant of the truth of the matter; (4) it must have been made with the intention that the other party

should act upon it; and (5) the other party must have been induced to act upon it.' "

To the same effect see 19 Am. Jur., Estoppel, § 62, pages 676, *et seq*. and 31 C. J. S., Estoppel, § 69 (a), pages 260, *et seq*.

"The doctrine of *estoppel in pais* is purely an equitable one, and it is essential to the application of that principle that a party claiming to have been influenced by the conduct of another to his injury was ignorant of the state of facts relied on to constitute such estoppel. *C. & O. Ry. Co. v. Walker*, 100 Va. 69-70, 92-93, 40 S. E. 633, 914, and authorities cited. And still less can he base a claim for an estoppel upon the acts or conduct which were induced by his own acts, and *a fortiori* on those induced by his own fraud or false representations." *Luck Construction Company* v. *Russell County*, 115 Va. 335, 342, 79 S. E. 393; *Cary* v. *Northwestern Mutual Life Ins. Co.*, 127 Va. 236, 246, 103 S. E. 580; *Sutton Co. v. Wise Contracting Co.*, 197 Va. 705, 710, 90 S. E. 2d 805.

The conveyance of the Market lot to D. and J. was a device or subterfuge to escape a direct conveyance to Trayer personally. Immediately after notice of that conveyance, Parking protested the transaction as a violation of the duty owed to it by director, Trayer. Trayer then induced Parking to enter into lease negotiations for both the Market and the Morley lots. Parking, lured by the prospect of additional parking space, seeking to obtain an amicable solution of the controversy, and to get out of the situation in which it had been placed by Trayer's failure to observe his obligation, entered into lease negotiations. Thereafter, the insistence by Trayer upon provisions which were not acceptable to Parking made an agreement of lease impossible. Thus, Trayer took advantage of the situation for his own benefit. A party who prevents a thing from being done should not be allowed to avail himself of the non-performance which he has occasioned.

No formal action by the board of directors was taken at the July 27th meeting. The minutes of that meeting record only the individual expressions of the directors present with reference to filing suit against Trayer. It was but natural for them to hope that the pending negotiations for a lease might be settled satisfactorily and thus avoid legal action.

In 31 C. J. S., Estoppel, § 75, page 281, we find this:

"The doctrine of estoppel is for the protection of innocent persons, and only the innocent may invoke it. There is, in the very

nature of the doctrine, some element of the maxim that one must come into a court of equity with clean hands. It is essential that the party claiming the benefit of the estoppel should have proceeded in good faith. A person may not predicate an estoppel in his favor on, or assert such estoppel for the purpose of making effective, obtaining, the benefit of, or shielding himself from the results of, his own fraud, violation of law, wrongful act, or other inequitable conduct in the transaction in question; and the same is true of a fraudulent plan which he designed and an attempt to defraud in which he was an active participant. Neither may he base a claim of estoppel on conduct, omissions, or representations induced by his own conduct, concealment, or representations, especially when fraudulent. So one party to a scheme to defraud cannot base an estoppel on another's acts under the scheme. * * *"

In 19 Am. Jur., Estoppel, § 42, pages 640 and 641, this is said:

"The doctrine of estoppel in pais is founded upon principles of morality and fair dealing and is intended to subserve the ends of justice. It always presupposes error on one side and fault or fraud upon the other and some defect of which it would be inequitable for the party against whom the doctrine is asserted to take advantage. * * *"

The authorities are agreed that where one relies on estoppel *in pais*, the burden is on him to prove the essentials of such an estoppel by clear, precise and unequivocal evidence. The evidence must not leave the matter to mere inference or conjecture. It must be certain in every particular. 31 C. J. S., Estoppel, § 160, page 454, and § 162, page 457; 19 Am. Jur., Estoppel, §§ 198 and 199, pages 852, *et seq.*

It is true that the evidence here is in conflict; but it is equally true that appellants have not clearly proven the essential elements of an estoppel. Parking has not been shown to have made a false representation or concealment of any material fact, with the intention that Trayer should act upon such representation or concealment. Trayer and D. and J. were not ignorant of the truth of the matters in issue. Their claim for an estoppel is based upon acts or conduct which were induced by the acts of Trayer. No benefits of any kind have been received by Parking. Its efforts to reach an agreeable settlement were futile, because of the failure of Trayer to carry out his proposal to lease the whole of the Market and Morley lots to Parking.

We are not impressed with the claim of Trayer that appellants changed their status and incurred expenses as a result thereof in reliance upon the acts of Parking. Trayer knew, or ought to have

known, that Parking had not "acquiesced" in the conveyance of the Market lot to him personally; that it merely sought to settle the controversy after the purchase of the Morley lot by substituting a lease for additional property. Trayer was a participant in the joint enterprise to construct the proposed motel. No lease was ever executed between the persons interested in the construction of the motel; nor are any of the persons involved in that project, except Trayer, parties to this proceeding. It is difficult to believe that they were ignorant of the contention between the parties here. With knowledge of the existing controversy, Trayer expended some money in furtherance of the proposed motel agreement and construction; but he did so at his own risk. He cannot now be allowed to reap any benefit from his wrongful conduct.

Numerous cases are cited by appellants relating to the exercise of the right of estoppel by conduct of the party sought to be estopped. An examination of those cases discloses that the facts therein stated make the principles there applied inapplicable to the facts of this case. What will amount to a sufficient acquiescence in any particular case must largely depend upon its own special circumstances. The special circumstances here distinguish the case from each of those cited by appellants.

We find no error in the decree of the trial court, and it will, therefore, be affirmed.

*Affirmed.*