GALLIMORE, INC., Plaintiff,

v.

The HOME INDEMNITY COMPANY,
Defendant.

Civ. A. No. 74–102.

United States District Court,
W. D. Virginia,
Roanoke Division.

May 3, 1977.

Kenneth E. Trabue, Hunter, Fox & Trabue, Roanoke, Va., for plaintiff.

Ronald M. Ayers, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., for defendant.

## OPINION AND ORDER

DALTON, District Judge.

The plaintiff, Gallimore, Inc., a Virginia corporation, brought this action against The Home Indemnity Company, a New York corporation, seeking to hold The Home Indemnity Company liable on a contractor's bond. Jurisdiction is predicated on diversity of citizenship and more than $10,000.00 in controversy. The facts have been stipulated and the matter submitted to the court for its determination.

On April 26, 1972, Gallimore, Inc., entered into a general contract with the Montgomery County School Board for the construction of an elementary school. The contract between Gallimore and the School Board required a payment bond for each subcontractor equal to 50% of the subcontract, although it did not require the procurement of performance bonds. On May 18, 1972, Gallimore subcontracted the electrical work on the school project in the amount of $104,000.00 to Martin Electric, Inc. This subcontract required a 50% payment bond, although no performance bond was required. On May 19, 1972, pursuant to the bond requirements of the subcontract, Martin Electric obtained a labor and material payment bond in the amount of $52,000.00 from The Home Indemnity Company. According to the terms of this bond, Martin Electric was designated as the principal for payment, The Home Indemnity Company as surety, and Gallimore as obligee. Although a performance bond was never issued, a notation in the lower left hand corner of the bond stated that it was " . . . issued simultaneously with another bond in favor of the general contractor conditioned for the full and faithful performance of the contract." (Stipulation-Exhibit A). The relevant portion of the bond setting out the terms of liability provided:

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the subcontract, then this obligation shall be void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

(1) A claimant is defined as one having a direct contract with the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the subcontract.

(2) The above-named Principal and Surety hereby jointly and severally agree with the Obligee that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Obligee shall not be liable for the payment of any costs or expenses of any such suit.

For this bond, Martin Electric paid The Home Indemnity Company a premium of

$520.00 which was based upon the standard rate of $5.00 per thousand for a 50% labor and material payment bond. The only other bond available was a 100% performance and payment bond for which a premium of $1,026.00 would have been charged, based on a rate of $10 per thousand on the first $100,000.00 and $4.50 per thousand on the excess. (Stipulation page 3).

In October of 1972, Martin Electric accepted a quotation from Virginia Melody and Sound, Inc., for $17,230.00 for a complete sound system for the project and issued a purchase order for that amount on October 10, 1972. (Stipulation page 3). Virginia Melody delivered material to the project site and submitted two invoices, totalling $421.00, the last of which was dated January 16, 1973. (Stipulation page 4). However, due to Martin Electric's financial condition, Virginia Melody refused to proceed on the project without guarantee of payment from Gallimore.

As of May 25, 1973, Martin Electric had no workers on the job and Gallimore informed Martin Electric that if they did not return to the job as of June 8, 1973, their contract would be terminated and a new subcontractor would be hired. They failed to return on the 8th and their contract was terminated, and the R & M Electric Company was contracted with for completion of the electric subcontract. Gallimore then entered into an agreement with Virginia Melody for the furnishing of all labor, material, and equipment for the installation of a complete sound system. The agreed price of this contract was $16,809.00 which equaled the balance remaining in the Martin Electric-Virginia Melody agreement. In accordance with its contract, Virginia Melody was paid the full amount of the subcontract through four payments by Gallimore.

Previously, early in 1973, the General Electric Supply Company agreed with Martin Electric to furnish the lighting fixtures required in the electrical subcontract, but after a problem arose as to the manner of payment, refused to ship the equipment except upon a purchase order directly from Gallimore as the general contractor. Galli-more agreed, and pursuant to the change orders, the General Electric Supply Company furnished the material to them, although installation was performed by Martin Electric until its cessation of work on the project on May 25, 1973. (Stipulation pages 5, 6, 8). According to its orders, Gallimore actually paid the General Electric Supply Company $43,204.37.

Prior to Martin Electric's default, Gallimore had become concerned about Martin Electric's financial condition and contacted the Thomas Rutherford Bonding Insurance Company, an agency for The Home Indemnity Company, and received a response that Martin Electric was "bonded", and this was interpreted by Gallimore to mean "that Gallimore need not worry if Martin Electric failed to perform or to pay its suppliers or laborers on the project." (Stipulation page 4). Although the "vice president of Gallimore and the principal contact for the general contractor in all dealings with the subcontractor was of the impression that the bond written by The Home contained both the payment and the performance obligation", no inquiry was made as to whether or not a performance bond existed, and none in fact had ever been issued. (Stipulation page 3).

Martin Electric has been adjudged bankrupt, and Gallimore is seeking to recover from The Home Indemnity Company the losses it incurred through Martin Electric's inability to perform on its contracts. Plaintiff asserts that there are two grounds for recovery. First, he argues that by virtue of its actions The Home Indemnity Company is estopped to deny coverage. Second, he claims rights to subrogation, and in furtherance of this argument, he contends that the bond that was issued contained an express obligation of performance and that the performance obligation is also implied in the bond by virtue of the provisions of Va.Code Ann. § 11–23, which provides performance coverage in certain instances.

Regarding his first argument, the plaintiff contends that the defendant is estopped to deny coverage because of the notation appearing on the face of the bond indicat-

ing that it was being issued simultaneously with the performance bond, because of defendant's representation that Martin Electric was bonded, and because of conduct of The Home Indemnity Company occurring after Martin Electric's default. Plaintiff does not maintain that he could have secured performance coverage once he learned of Martin Electric's poor financial condition, and the evidence nowhere establishes the likelihood that such coverage could have been obtained.

■ In *Trayer v. Bristol Parking, Inc.*, 198 Va. 595, 604–605, 95 S.E.2d 224, 231 (1956) quoting from its previous cases, the Virginia Supreme Court related the elements necessary to constitute an estoppel *in pais:*

> "(1) There must have been a false representation or concealment of material facts; (2) the representation must have been made with knowledge of the facts; (3) the party to whom it was made must have been ignorant of the truth of the matter; (4) it must have been made with the intention that the other party should act upon it; and (5) the other party must have been induced to act upon it."

The requirement that a representation be made with knowledge of the facts is not fulfilled unless the party to be estopped had knowledge of *all* of the facts or unless his ignorance was a result of gross negligence or otherwise involved gross culpability. See *American Mutual Liability Insurance Co. v. Hamilton*, 145 Va. 391, 135 S.E. 21 (1926); *Hyson v. Dodge*, 198 Va. 792, 96 S.E.2d 792 (1957). It is also as important to look to the fault or the lack of fault on the part of the party relying on the estoppel as it is to examine the conduct of the party against whom the estoppel is asserted:

> It is essential to the application of the principals of equitable estoppel, or estoppel in pais, that the party claiming to have been influenced by the conduct or declarations of another to his injury, was not only ignorant of the true state of facts, but had no convenient and available means of acquiring such information, and where the facts are known to both

parties, and both have the same means of ascertaining the truth, there can be no estoppel.

*Lindsay v. James*, 188 Va. 646, 659, 51 S.E.2d 326, 332 (1949).

Upon a review of the evidence this court must conclude that the plaintiff has failed to meet his burden of proof of establishing estoppel *in pais:*

> [W]here one relies on an estoppel in pais, the burden is on him to prove the essentials of such an estoppel by clear, precise and unequivocal evidence. The evidence must not leave the matter to mere inference or conjecture. It must be certain in every particular.

*Trayer v. Bristol Parking, Inc.*, 198 Va. 595, 606, 95 S.E.2d 224, 232 (1956). As to misrepresentations by the defendant, the evidence is equivocal at best. The communication by The Home Indemnity Company's agents that Gallimore was "bonded" was in fact true, although they were bonded for payment of labor and material and not for performance. Certainly, Gallimore's contracting agents should have known that no such bond was executed, and if it could be said that The Home Indemnity Company's agents were negligent in allowing this notation to appear on the bond, it would be equally true of Gallimore's agents. As to The Home Indemnity Company's actions after it became apparent that Martin Electric was or would be in default, the court finds nothing inconsistent with its position as surety under the labor and material payment bond. Although Gallimore may have been misled, it was as much responsible for its position as was The Home Indemnity Company.

■ In furtherance of a claim of estoppel there must be evidence of detrimental reliance. *Khoury v. Community Memorial Hospital, Inc.*, 203 Va. 236, 123 S.E.2d 533 (1962). Therefore, the time at which plaintiff began to rely on manifestations of The Home Indemnity Company is critical. According to the stipulations of the parties, the notation on the payment bond referencing the simultaneous issuance of a performance bond was not noticed until after prob-

lems arose on the subcontracts of Virginia Melody and the General Electric Supply Company with Martin Electric. (Stipulation page 11). Defendant's communication to plaintiff that plaintiff was "bonded" also occurred subsequent to the financial demise of Martin Electric. There is no conduct, representation, or communication on The Home Indemnity Company's part, alleged to have occurred prior to the time that Martin Electric's financial problems became evident. Therefore, assuming these facts how did plaintiff rely on The Home's representation to it's detriment? If the evidence established that plaintiff could have secured a bond for Martin Electric's performance after Martin Electric's financial condition became known then detriment would be apparent.

█ A party cannot claim estoppel unless he has been misled to his prejudice. This means that the reliance must occur prior to loss. *State Farm Mutual Automobile Insurance Co. v. Pederson*, 185 Va. 941, 41 S.E.2d 64 (1947). After it became apparent that Martin Electric's subcontract with Virginia Melody and the General Electric Supply Company were in jeopardy and Martin Electric's default was imminent, the only thing plaintiff could have done was provide for the completion of the remaining work itself or default on the prime contract. Consequently, this court must conclude that, not only has plaintiff fallen far short of proving misstatements or unequivocally misleading conduct on the part of the defendant, it has failed to show that its reliance on the defendant's conduct prejudiced its position.

█ In addition to its claim of estoppel, plaintiff maintains that it is subrogated to the rights of Virginia Melody and the General Electric Supply Company, which plaintiff claims were entitled to the performance obligation under the terms of the bond and by virtue of Va.Code Ann. § 11–23.

Looking to the rights of Virginia Melody and the General Electric Supply Company as laborers and materialmen under the terms of the bond, it is apparent that by virtue of the express terms of the bond any labor or material furnished by them to Martin Electric as a subcontractor would have fallen within its coverage. However, once they ceased furnishing labor and material to Martin Electric as subcontractor their rights were fixed under the terms of The Home Indemnity bond, as its coverage encompassed labor and materials furnished "in the performance of the subcontract". (Bond, *supra*). Because of Martin Electric's financial condition, the General Electric Supply Company and Virginia Melody refused to furnish it with materials, and consequently, the materials furnished were not furnished pursuant to their subcontract with Martin Electric but pursuant to their contracts with Gallimore. There being no labor and materials furnished to Martin Electric which Martin Electric has failed to pay for, there can be no liability of The Home Indemnity Company under the terms of its bond.

█ The plaintiff has argued that The Home Indemnity Company's duty as surety to pay for labor and materials "used or reasonably required for use in the performance of the contract" contemplates reimbursement for labor and materials whether or not they are in fact used if they are reasonably required for use. In effect, this is an argument for the contract price or for the imposition of a performance obligation. The bond itself is styled "subcontract labor and material payment bond", and there is nothing, according to its terms to indicate to the contrary.

In *Standard Accident Insurance Company of Detroit v. Rose*, 314 Ky. 233, 234 S.W.2d 728, 731 (1950) the Court considered the words "all labor and materials used or reasonably required for use in the performance of the contract" and concluded that they "were inserted in the bond to protect the surety against extravagant and unnecessary use of labor and materials as might be attempted by some contractors". In the present case, the phrase "reasonably required for use" is no more than a clause protecting the bonding company from excessive and unreasonable claims made by laborers and materialmen. Therefore, this

court finds no performance protection for laborers and materialmen under the express terms of the bond.

█ Plaintiff has argued that Va.Code Ann. § 11–23 applies so as to impose a performance obligation by operation of law. That section provides, in part, for the procurement of both performance and payment bonds by prime contractors who contract with local governmental authorities or their agencies for the construction, repair, or improvement of certain governmental properties. A party contracting with any of those authorities must obtain a performance bond solely for the protection of the authority and a payment bond for the benefit of any person who supplies either labor or materials directly to the party. The relevant portion of that section also provides for the procurement of payment bonds by subcontractors in favor of laborers and materialmen:

. . . . .

No contractor, as the lowest responsible bidder, shall subcontract any work required by the contract except under the following conditions: Each subcontractor shall furnish, and the contractor shall require as a part of the agreement between the subcontractor and the contractor, a payment bond with surety thereon in the amount of fifty percent of the work sublet to the subcontractor which shall be conditioned upon the payment to all persons who have, and fulfill, contracts which are directly with the subcontractor for performing labor and furnishing materials in the prosecution of the work provided for in the subcontract. Every such bond shall be construed, regardless of its language, as incorporating, within its provisions, the obligation to pay those persons who furnish labor or materials as aforesaid . . . . .

However, upon a review of § 11–23 this court finds no requirement that a subcontractor obtain a performance bond for the protection of laborers and materialmen, and the reading in of such a provision would clearly go beyond the purpose of that section.

The court in *Solite Masonry Units v. Piland Construction Company, Inc.*, Va., 232 S.E.2d 759 (1977) discussed the purpose of § 11–23. The question presented was whether a materialman who supplies his subcontractor with materials is entitled to recover for only those materials actually used in the construction project. The court found the statute's purpose to be to assure that laborers and materialmen will be afforded protection from defaulting contractors or subcontractors, equivalent to the protection afforded laborers and materialmen performing work on nongovernment construction jobs:

[i]t was enacted to afford protection to materialmen and subcontractors who cannot avail themselves of the provisions of code §§ 43–7 & 43–9, since mechanic liens cannot be perfected against public buildings.

Id. at 761.

Given the statute's purpose, the court held that a materialman who supplies a subcontractor with materials is entitled to recover for materials delivered to the subcontractor on the project but not actually used.

In the present case, the laborers and materialmen were protected on the subcontracts by the issuance of the material and labor payment bond. The statute requires no more, either by its language or in furtherance of its purpose. Consequently, it creates no interest to which plaintiff can be subrogated.

In conclusion, Gallimore Incorporated has no direct claim against The Home Indemnity Company by estoppel and cannot claim indirectly through subrogation to the rights of Virginia Melody and the General Electric Supply Company because they acquired none by either the express provisions of the bond or by virtue of Virginia Code Annotated § 11–23.

Judgment for Defendant.