## Richmond

COMMONWEALTH OF VIRGINIA, DEPARTMENT OF
MENTAL HEALTH AND MENTAL RETARDATION,
CENTRAL STATE HOSPITAL AND PIEDMONT STATE HOSPITAL

V.

SHERIFF OF NOTTOWAY COUNTY, ADMINISTRATOR,
D.B.N. FOR SOLOMON KING JEFFERSON

August 28, 1980.

Record No. 781268.

Present: All the Justices.

*Paul A. Sinclair, Assistant Attorney General (Marshall Coleman, Attorney General; James E. Ryan, Jr., Deputy Attorney General; Martin A. Donlan, Jr., Assistant Attorney General; George S. Cummins,* on briefs), for appellants.

*James T. Edmunds* for appellees.

POFF, J., delivered the opinion of the Court.

This is an appeal by the Department of Mental Health and Mental Retardation (the Department) from a judgment denying its claim against a decedent's estate for the unreimbursed costs of care and maintenance of the decedent while he was a patient in State mental hospitals.

Solomon King Jefferson died intestate on December 22, 1977, seised of 50 acres of land. Jefferson had been a patient at Central State Hospital and Piedmont State Hospital since February 2, 1972. Three months before his death, the Department filed a motion for judgment against him seeking damages of $18,964.73. This represented the balance due on total hospital and medical expenses incurred during the five years preceding June 30, 1977 after deduction of receipts from Medicare, Medicaid, and Jefferson's railroad retirement benefits. The Department also claimed damages for all unreimbursed costs incurred pending judgment. Jefferson's *guardian ad litem* filed an answer submitting his interests to the protection of the court. On November 1, 1977, the court awarded the Department judgment for $20,343.33.

Later that month Mrs. Ethel J. Wright and Mrs. Dora J. Hubbard, two of Jefferson's five children, moved to vacate the judgment and asked leave to present "after-discovered evidence". Although the movants were not parties to the action, the court granted the motion and trial was held on December 14, 1977. After Jefferson's death

the following week, the court substituted Jefferson's administrator, d.b.n., Sheriff of Nottoway County, as the party defendant.

Quoting from the trial exhibits and a statement of facts filed pursuant to Rule 5:9(c), we summarize the evidence.

Shortly after Jefferson's hospitalization, A. M. Chaffins, the Department's reimbursement field representative, contacted Mrs. Wright and two of her sisters "to explain the cost of care and his responsibility to secure some partial defrayment of the charges". He told them that the duty to pay "accrued charges" was "the patient's primary responsibility and his children's or his real estate's ultimate responsibility". Chaffins testified that he "never at any time said or implied" that he had authority "to waive any statutory requirement for collection of charges".

The daughters were asked to file the Department's form DMH 201, a financial disclosure statement. Section 15 stated that "[t]he patient or the person legally liable for the patient remains liable for any difference between accumulated charges and the amount paid by insurance or other benefits." The form delivered to Mrs. Wright showed that a patient's costs were "$8.50 per day". Although she did not sign the form, Mrs. Wright acknowledged at trial that she had read section 15.

None of Jefferson's children agreed to make any payment from personal funds to defray the costs of his hospitalization. However, Mrs. Wright was the representative payee of Jefferson's railroad retirement benefit checks appointed under 45 U.S.C. 228s to manage the funds on his behalf. In a Departmental form signed March 28, 1972, she agreed that, "in consideration of the care and treatment afforded" her father, she would pay the Department "the sum of $160.00 from Railroad Retirement Benefits each month". The document further provided that "[i]t is understood that the amount agreed upon will be paid in addition to any hospitalization insurance benefits, which together are not to exceed the full charges." In a letter accepting the offer, the Department advised Mrs. Wright that it "reserve[d] the right to adjust charges from date of admission, if further investigation reveals financial ability on your part to assume a greater part of the cost involved in this patient's treatment."

In July 1976, the Department asked Mrs. Wright to sign a new agreement increasing the payment to $9.00 per day "[d]ue to the increase in Railroad Retirement benefits you are receiving". On August 4, 1976, Mrs. Wright executed the new agreement which contained language substantially the same as that in the first. At that

time "the patient's monthly charge [was] approximately $850.00". "When asked by the Court . . . Mrs. Wright said . . . that she was unable to explain how she could have thought she was paying the entire monthly bill."

Using the proceeds of the railroad retirement checks, Mrs. Wright paid the bills submitted to her monthly by the Department. Each showed the agreed amount due for "period covered" and a zero balance for "unpaid balance forwarded". Although Mrs. Wright did not testify that Chaffins "in any way . . . led them to believe that the total hospitalization charge . . . was only $9.00 per day," she said that she "thought the partial payments were taking care of the entire account." Chaffins testified that "the zero balance only meant that no further balance was due that month on the agreed partial payment received." He "admitted that he never sent any bills" to Jefferson or members of his family for the unreimbursed costs.

In a letter, opinion incorporated in the final order entered June 5, 1978, the trial court found that "[i]t would be unjust for the Commonwealth to deal with Mrs. Wright as agent for Solomon Jefferson as it has over the years making no reference to the huge accumulating debt", and then seek to collect the arrearage. Holding that the August 4, 1976 agreement signed by Mrs. Wright constituted a "novation" which relieved Jefferson's estate of liability for payments in excess of those fixed in the agreement, the court granted final judgment for the administrator.

Preliminarily, the Department contends (1) that, because Mrs. Wright and Mrs. Hubbard were not parties litigant, they had no standing to make the motion to vacate the original judgment; (2) that the original judgment was a default judgment and the motion to vacate alleged none of the grounds specified in Code § 8.01-428; and (3) that, if the original judgment was not a default judgment, the evidence proffered in support of the motion to vacate did not satisfy the after-discovered evidence rule announced in *Reiber* v. *Duncan*, 206 Va. 657, 663, 145 S.E.2d 157, 161-62 (1965). Since we have reached a decision to reverse the final judgment on the merits, we need not address these issues.

While the trial court based its final judgment upon a finding that the August 4, 1976 agreement was a "novation",[1] we agree with

---

[1] "[N]ovation is defined as a mutual agreement among all parties concerned for discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor or another. To effect a novation there must be a clear and definite intention on the part of all concerned that such is the

the administrator's construction of the holding below: "The Trial Court . . . held that the Department had validly contracted or agreed to accept less than the actual per capita cost for Mr. Jefferson's care and maintenance." Characterizing the August 4, 1976 agreement as a "compromise" and "an accord and satisfaction", and referring to "novation" only in passing, the administrator contends that "Mrs. Wright had the authority to negotiate with the Department for the payment and compromise", that "Mr. Chaffins had the authority to compromise", and that "Mr. Chaffins in fact properly compromised these charges."[2] Accordingly, we must determine whether the agreement between Mrs. Wright and the Department constituted a contract of compromise and settlement binding upon the Commonwealth.

From the language of the letter opinion, it would appear the trial court concluded that the Department was equitably estopped by its course of dealings with Mrs. Wright as "agent" for her father to deny her authority to bind him and his estate in such a contract. Aside from the question whether the doctrine of equitable estoppel applies against the sovereign in the exercise of its governmental functions, *see Commonwealth v. Wash. Gas Light Co.,* 221 Va. 315, 269 S.E.2d 820 (1980), this day decided, we fail to see how, in a case like this, a principal-agent relationship between two parties can arise from the conduct of a third party. So far as the record shows, Jefferson, an incompetent, granted Mrs. Wright no express authority, clothed her with no apparent authority, and ratified nothing she did in his name with respect to his property. In its dealings with Mrs. Wright as representative payee of Jefferson's railroad retirement benefits, the Department dealt with her as a special agent, one created by federal statute with authority limited to a single asset. As such, she had no power to enter into contracts

---

purpose of the agreement, for it is a well settled principle that novation is never to be presumed."
*Honeywell* v. *Elliott,* 213 Va. 86, 89, 189 S.E.2d 331, 334 (1972).

Williston and Corbin feel that the term "novation" is best applied only when the substituted contract has a *new* party, either a substituted obligor or obligee. S. Williston, Contracts, Sec. 1865 (3d ed. 1938); 6 A. Corbin, Contracts, Sec. 1293, 1297 (rev. ed. 1962). *See also* Restatement, Contracts, Sec. 424 (1932).

[2] Alternatively, the administrator argues that, under Code § 11-12, the payments from Jefferson's railroad retirement benefits constituted part performance of his obligation to the Commonwealth which, when accepted by the Department, extinguished the obligation. Although this argument was urged below, the trial court did not base its judgment upon that ground, the administrator has not assigned cross-error, and we will not notice this issue. Rule 5:27.

compromising and settling obligations imposed by state statute upon Jefferson and the assets of his estate at large.

■ We consider next the administrator's contention that Chaffins had authority to bind the Commonwealth in such contracts.

According to Chaffins' uncontradicted testimony, he never said or implied in his conversations with Jefferson's children that he had authority "to waive any statutory requirement for collection of charges". His authority was no greater than that delegated to the Department by the General Assembly, and we will examine the relevant statutes.

Under Code § 37.1-105, any patient in a State hospital "or the estate of any such patient or the person or persons legally liable for the support of any such patient, shall be liable for the expenses of his care, treatment and maintenance", provided that payments "shall not exceed the actual per capita cost" and that "in no event shall recovery be permitted for amounts more than five years past due." During the patient's lifetime, "the estate of such patient . . . shall not be depleted below the sum of five hundred dollars." Code § 37.1-109. Upon the death of a former patient, this depletion restriction "shall after funeral expenses have no further application", but the claim against the decedent's estate is limited to "charges remaining unpaid and not more than five years past due", and the decedent's real estate is exempt so long as it is "occupied by the surviving spouse of the patient, or . . . by any dependent child". Code § 37.1-117.

■ The Department is not required to collect charges in full when collection "would work a [financial] hardship on such patient, or the person legally liable for his support." Code § 37.1-116. And, having "due regard for the financial condition and estate of the patient, his present and future needs and the present and future needs of his lawful dependents," the Department may contract with the patient or persons liable for his support and "agree to accept . . . less than the actual per capita cost of his maintenance". Code § 37.1-109. But that statute makes it clear that such an agreement is merely transitory:

> "Nothing contained in this title shall be construed as making any such contract permanently binding upon the Department or prohibiting it from periodically reevaluating the actual per capita cost of care, treatment, and maintenance and the financial condition and estate of any patient, his present and future needs and the present and future needs of his lawful dependents and

entering into a new agreement with the patient . . . or the person liable for his support and maintenance, increasing or decreasing the sum to be paid".

The public policy underlying this statutory complex is plain. Mental health is a legitimate goal of the State. Under its police powers, the Commonwealth constructs, staffs, supplies, and operates hospitals to promote that goal. The General Assembly has devised a plan to fund the services provided patients in State facilities. Costs not financed otherwise are to be paid by the patient or those legally liable for his support to the extent payment does not cause financial hardship. Only when all other receipts leave a deficit does the cost fall upon the public fisc.

The Department charged with enforcement of this policy is empowered to enter into agreements with the statutory obligors modifying their obligations. But it can do so only when necessary to avert financial hardship,[3] and agreements based upon hardship may be unilaterally repudiated by the Department as economic circumstances change.

It may be that the August 4, 1976 agreement was negotiated to spare the patient a potential hardship. Jefferson's real estate could have been subjected to the unreimbursed costs accumulated at that time. It was always possible, however, that future therapy would prove successful and that Jefferson would be released from the hospital and returned to his home. Apparently, such a contingency is what prompted the Department to agree to look to the patient's current income rather than the corpus of his estate.

█ Inherent in every such agreement is the statutory proviso that it is not "permanently binding upon the Department". Circumstances prevailing in 1976 have changed. The Department's claim, originally asserted against the patient, survives his death and attaches to his estate. The decedent left no surviving spouse or dependent children. The interests of his heirs, none of whom has borne any of the expenses incurred by the Commonwealth, are subordinate to the debts of the estate. And the Department makes no claim against any person liable for the patient's support. Hence, there is nothing of record

---

[3] Where, as here, a patient's assets or those of an estate of a former patient are sufficient to pay the unreimbursed costs in full, only the Attorney General or the assistant Attorney General assigned to the Department may compromise and settle claims for hospital costs for less than fifty thousand dollars. Code § 2.1-127 (Repl. Vol. 1979).

to show that enforcement of its claim will cause any financial hardship upon anyone protected by the statute.

We hold, therefore, that the August 4, 1976 agreement did not constitute a compromise and settlement as the administrator contends and that the Department has both the authority and the duty to collect the debt imposed by the legislature upon the decedent's estate.

■ Finally, the administrator argues that "[w]hile [Code § 37.1-109] may afford the Department the power to modify agreements prospectively under certain circumstances . . . the statute did not afford the Department power to modify its agreements . . . retroactively". Having only recently decided otherwise, *Commonwealth v. Sharrett,* 218 Va. 684, 687, 240 S.E.2d 522, 523 (1978), we reject this argument.

The judgment will be reversed and the case remanded for entry of final judgment for the Commonwealth for the unreimbursed costs incurred during the five years preceding the date of the hearing below, with interest from that date.

*Reversed and remanded.*