## Richmond

UTICA MUTUAL INSURANCE COMPANY AND SAFEGUARD INSURANCE COMPANY v. NATIONAL INDEMNITY COMPANY AND OBADIAH R. MERRICKS.

April 27, 1970.

Record No. 7132.

Present, All the Justices.

*John L. Walker, Jr.; James I. Moyer* (*O. Dalton Baugess; Woods, Rogers, Muse, Walker & Thornton,* on brief), for appellants.

*Richard C. Rakes* (*Gentry, Locke, Rakes & Moore,* on brief), for appellees.

HARMAN, J., delivered the opinion of the court.

This is an appeal from a final decree in a declaratory judgment suit wherein the trial court declared void *ab initio* a policy of automobile liability insurance issued by National Indemnity Company

("National"), to John Taylor Brown, deceised, ("Brown"). The decree further provided that National had no duty to pay any part of a judgment obtained by Obadiah R. Merricks against Brown's administrator.

This case was heard by the trial court on depositions and the exhibits which were filed.

We awarded an appeal from the decree to Utica Insurance Company ("Utica") and Safeguard Insurance Company ("Safeguard"), who were made parties defendant in the court below.

The evidence discloses that Brown contacted James F. Firebaugh, an agent for Nationwide Insurance Company in Roanoke, Virginia, requesting that Firebaugh issue an automobile liability insurance policy with his company covering Brown's automobile.

Firebaugh, whose brother was married to Brown's aunt, determined from his initial conversation with Brown that he was unmarried and under twenty-five years of age.

Firebaugh advised Brown that he could not write the coverage with Nationwide Insurance Company because Brown would not qualify under the underwriting standards established by that company. He advised Brown, however, that he would attempt to place this business and obtain coverage for him through another company.

On June 2, 1964, Firebaugh obtained from Brown, on forms provided by Insurers of Virginia, Incorporated, the general agent for National, a written application for an automobile liability insurance policy. When required by the application to "List any impairments you may have," Brown responded "None."

The written application and net premium were forwarded to National's general agent and on June 3, 1964, a liability insurance policy for minimum limits was issued covering Brown's car from that date to June 3, 1965. It should be noted that this policy was a voluntary contract entered into between Brown and National and that Brown was neither a "statutory risk" under the provisions of the Motor Vehicle Safety Responsibility Act, Code § 46.1-388 to 46.1-514, nor a "poor risk" who obtained his coverage under the Virginia Assigned Risk Plan set up pursuant to Code § 38.1-264.[1]

When the original policy expired on June 3, 1965, it was not immediately renewed because the renewal premium had not been paid. The premium had been substantially increased due to a speeding conviction of Brown in February, 1965. Subsequently, on July

---

[1] The terms "statutory risk" and "poor risk" are used here as they are defined in *Virginia Farm Bureau Mut. Ins. Co. v. Saccio*, 204 Va. 769, 133 S.E.2d 268 (1963).

26, 1965, a renewal was requested and the premium was paid by Brown. The renewal policy, which was issued on July 26, 1965, is the policy with which we are now concerned. This policy shows on its face that it is a renewal of the policy issued on June 3, 1964.

On September 26, 1965, while operating his car in Henry County, Virginia, Brown suffered an epileptic seizure and his car collided with a car owned and driven by Obadiah R. Merricks. At no time prior to this accident, which gave rise to the claims under the policy, did National or any of its agents have actual knowledge that Brown was suffering from epilepsy.

At the time of the application, Firebaugh, because of his family connection with Brown, knew that Brown's father committed suicide in 1961 and that Brown had been the one who first discovered his father's body. Firebaugh knew that Brown had been treated by a physician for an "emotional strain" or "nervous disorder" following this incident. Firebaugh discussed this with Brown and from the conversation "determined that this did not affect his driving."

Brown did not reveal to Firebaugh that he had suffered from grand mal epileptic seizures since shortly after his father's death in 1961 and that he was receiving daily doses of Dilantin, a drug used for the treatment and control of such a condition.

The evidence establishes that Brown had suffered a grand mal epileptic seizure on February 23, 1963, which resulted in a loss of consciousness. In November, 1963, when he applied for a renewal of his operator's license, he disclosed this information to the Virginia Division of Motor Vehicles ("D.M.V.") and his license renewal application was refused.

Brown was not licensed to drive a motor vehicle from November, 1963, until March, 1964, when a new license was issued after his physician certified to D.M.V. that he had suffered no epileptic seizures for more than one year. This license was issued on condition that Brown would file with D.M.V., at least every six months, an acceptable physician's statement about his medical condition.

National's agent, as a part of its routine procedure, after the initial policy was issued and again before the renewal policy was issued, received from D.M.V. an "operation record" check on Brown. From the information furnished by D.M.V., National knew that Brown was licensed to drive, that he had been involved in no reported accidents and that he had been convicted of speeding in February, 1965. The D.M.V. reports, while showing that Brown was re-

quired to wear "corrective lenses" while driving, did not disclose the information in D.M.V. files regarding Brown's epilepsy.

The first argument advanced by Utica and Safeguard is that Brown made no material misrepresentation of fact in the insurance application. They argue, in this connection, that the word "impairment," as used in the application, is ambiguous and that this ambiguity should be resolved against National.

We find no ambiguity in the word "impairment" as it is used in the application for insurance. We agree with the able trial judge that "impairment" as used in the application ". . . could mean nothing else than that which would or might affect the ability of the insured to operate the car safely. Surely this could not have been misunderstood by a reasonably intelligent person, and the evidence shows that Brown was clearly within that classification."

Code § 38.1-336 provides:

"All statements, declarations and descriptions in any application for a policy of insurance or for the reinstatement thereof shall be deemed representations and not warranties, and no statement in such application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance, or be construed as a warranty, anything in the policy to the contrary notwithstanding, unless it is clearly proved that such answer or statement was material to the risk when assumed and was untrue."

Under this statute we have uniformly held that misrepresentations of facts, in an application for insurance, material to the risk when assumed renders the contract void. *State Farm Mut. Automobile Ins. Co. v. Butler, Admr.,* 203 Va. 575, 125 S.E.2d 823 (1962); *Scott v. State Farm Mut. Automobile Ins. Co.,* 202 Va. 579, 118 S.E.2d 519 (1961); *Inter-Ocean Ins. Co. v. Harkrader,* 193 Va. 96, 67 S.E.2d 894 (1951); *North River Ins. Co. v. Atkinson,* 137 Va. 313, 119 S.E. 46 (1923).

From the evidence before us there can be no question that Brown, at the time he made his written application for the policy, was suffering from epilepsy and that he was aware of his condition. It is, therefore, obvious that his representation regarding "impairments" was false.

The record discloses that National was principally engaged in writing so-called "substandard" risks at increased rates and that its underwriting standards were extremely liberal when judged by industry

standards. The fact that the representation was material to the risk when assumed is fully established by the uncontroverted evidence that Brown would not have met even National's liberal standards had there been a disclosure of his epileptic condition.

The next contention of Utica and Safeguard is that the trial court erred in considering the written application as a part of the renewal policy since there was a lapse of approximately seven weeks from the date coverage expired under the original policy before the renewal policy was issued. The record, however, shows that this question was not raised before the trial court. We hold that it cannot now be raised for the first time in this court. Rule 1:8, Rules of Court; *Wash* v. *Holland*, 166 Va. 45, 54, 183 S.E. 236, 240 (1936); *Nationwide Mutual Insurance Company* v. *Tuttle*, 208 Va. 28, 31, 155 S.E.2d 358, 360 (1967); *Forester* v. *Commonwealth*, 210 Va. 764, 173 S.E.2d 851 (1970).

The last assignment of error relied on by Utica and Safeguard is that National is estopped and has waived its right to have the policy issued to Brown declared void *ab initio*.

It is elementary that the burden rests on the party relying on a waiver or estoppel to prove the essentials of such waiver or estoppel by clear, precise and unequivocal evidence. The evidence must not leave the matter to mere inference or conjecture but must be certain in every particular. *Trayer* v. *Bristol Parking, Inc.*, 198 Va. 595, 606, 95 S.E.2d 224 (1956). See also 7 Michie Jur., Estoppel § 39, p. 307 and 19 Michie Jur., Waiver § 5, p. 537.

Nothing in the application or in the "operation record" check gave National any reason to suspect that Brown had misrepresented the facts set forth in his application.

No evidence has been produced to show that National had information which might be sufficient to put it on notice to make further inquiry or investigation beyond the routine "operation check" which was made.

Moreover, the evidence establishes that Brown not only concealed his condition in the application and in his discussions with Firebaugh, but that he also concealed it from a physician who had seen and treated him for various ailments on at least nine occasions during 1965 prior to the accident of September 26, 1965.

We agree with the court below that Utica and Safeguard have failed to carry the burden of proof to establish either a waiver or an estoppel.

The decree is affirmed.                                    *Affirmed.*