# Richmond

## COMMONWEALTH OF VIRGINIA, EX REL., ATTORNEY GENERAL OF VIRGINIA

### v.

## WASHINGTON GAS LIGHT COMPANY AND STATE CORPORATION COMMISSION

August 28, 1980.

Record No. 800131.

Present: Carrico, Harrison, Cochran, Poff, Compton, Thompson, JJ., and Harman, S.J.

*Norman K. Marshall, Assistant Attorney General (Marshall Coleman, Attorney General; John G. MacConnell, Assistant Attorney General; Kenneth W. Thorson, Assistant Attorney General,* on briefs), for appellant.

*John W. Riely; Lewis S. Minter (Lewis Carroll [D.C.]; Edward L. Flippen; Carl W. Belcher [D.C.]; Douglas V. Pope [D.C.]; Hunton & Williams,* on briefs), for appellees.

POFF, J., delivered the opinion of the Court.

On this appeal, we review an order of the State Corporation Commission sitting as a trial court, Code § 58-1124. The order granted a petition filed under Code § 58-1122 by Washington Gas Light Company (WGL), a public utility as defined by Code § 56-232. The petition alleged that certain taxes paid under Code §§ 58-603 and -661 (collectively, gross receipts taxes) had been erroneously assessed upon WGL's revenue from five "spot sales" of natural gas, *i.e.,* sales made by one Virginia gas distributor to other utilities distributing gas in Virginia, and that the payment should be refunded. The Commonwealth, *ex rel.* the Attorney General, Division of Consumer Counsel, intervened below and has perfected this appeal from the Commission's decision of September 28, 1979.

## I. THE FACTS

In the fall and winter of 1975-76, Virginia experienced a severe shortage of natural gas. Under authority granted in Code §§ 56-249.1 and -250 (the emergency powers statutes), the Commission entered an order on October 8, 1975 adopting a Plan of Natural Gas Cur-

tailment Priorities and Conservation Guidelines (the Plan). The purpose of the Plan was to relieve regional gas shortages by facilitating the allocation and transfer of available gas supplies among Virginia distributors.

On November 18, 1975, a member of the Commission's Accounting Division staff advised WGL by telephone that gross receipts taxes would not be assessed on spot sales made pursuant to the Plan. By letter agreements dated that day and the next, WGL concluded two of the five sales subject to the disputed assessment. Jeremiah Hughitt, a WGL Vice-President, testified below that he had negotiated these sales in reliance upon the telephone call and had "not include[d] a factor for gross receipts tax in the price." "[I]t was our objective," he said, "to provide [gas] at an equitable price as well as one that would return us sufficient return." Concerning the November 18, 1975 sale, an official of the purchasing distributor avowed by affidavit that "[n]either the initial agreement nor . . . any discussions with reference thereto . . . made any reference to gross receipts taxes or the amounts thereof."

On February 2, 1976, Lewis S. Minter, then the Commission's Deputy General Counsel and now General Counsel, circulated a memorandum among the Commissioners and the Commission's Public Service Taxation Division to "confirm prior legal opinions underlying Commission decision not to apply the gross receipts tax to sales between gas companies in compliance with [the Plan]". WGL received a copy of this memorandum from the Commission staff. The substance of the memorandum was repeated in a letter to WGL signed by Edward M. Vassar, the Commission's Chief Accountant. The Vassar letter, dated February 9, 1976, stated in part:

"The tax provided by Code § 58-603 by its terms, is 'for the privilege of exercising its franchise in this State. . . .' The Commission has decided that the transfer and sale of gas from one utility to another, when necessary to protect the public health, safety or welfare in this time of energy crisis, does not, in its opinion, emanate from any exercise of franchise rights by a utility and to impose a gross receipts tax in such cases would not only involve double or triple taxation of the commodity— to the ultimate detriment of consumers—but would appear clearly to be contrary to statutory intent."

WGL concluded the other three spot sales covered by the contested assessment by letter agreements dated March 25, 1976, April

1, 1976, and September 16, 1976. A negotiator for one of the purchasers filed an affidavit stating that "there was no discussion during such negotiations . . . of the applicability of Virginia Gross Receipts Taxes". According to WGL, all five sales were made "pursuant to the Plan" and, "based on the Commission's advice, both oral and written," were negotiated "without making any cost adjustment for gross receipts taxes."

In a May 6, 1977 letter addressed to "Each Gas Utility", Richard D. Rogers, Jr., then the Commission's General Counsel, explained that the Minter memorandum was "an *internal* memo" applicable to "a specific transfer of gas between two companies in compliance with Commission directive" and was never "intended to apply generally". The Rogers letter advised the distributors that the "earlier advice" was withdrawn and that the Commission would assess gross receipts taxes on "revenues from all sources in accordance with heretofore established practice."

The following week, the Taxation Division assessed taxes aggregating $241,150.53 upon WGL's gross receipts from the five spot sales. Paying under protest, WGL asked the Commission to reconsider its position, apply the tax "only on a prospective basis", and refund the payment. In a letter dated September 28, 1977, S. C. Burruss, Director of the Commission's Public Service Taxation Division, advised WGL that the Rogers letter countermanding the Minter memorandum "resulted from apparent misunderstanding on the part of some gas companies and some members of the Commission's staff which led to applications of questionable merit for exemptions from the gross receipts tax." Burruss's letter continued:

"However, it now appears that your company, in reasonable reliance upon communications from our staff, may have acted to its detriment in specific instances by failing to include a sum sufficient to cover gross receipts tax liability as part of negotiated sales of gas to other utilities.

"Under the law, the only procedure for obtaining a correction of the tax assessed and collected is to petition pursuant to Code §§ 58-1122 *et seq.*"

WGL filed its petition on December 23, 1977.[1] Among its prefiled exhibits, WGL included the letter contracts for the five spot

---

[1] The Commission advised us on brief that "[a] similar petition from one other company has also been filed and is being held in abeyance pending the outcome of the WGL appeal."

sales at issue and for two spot sales made on December 1, 1978 and February 26, 1979. Only the contracts for the last two sales contained a gross receipts tax clause. Additional exhibits admitted into evidence included letter contracts for four spot sales made on April 5, May 5, June 13, and October 19, 1977. While two of these contracts were executed after the date of the Rogers letter, none of the four contained a gross receipts tax clause. Testimony at the hearing indicated that WGL had also made an unspecified number of spot sales in 1974 before the Plan was adopted.

## II. THE COMMISSION'S OPINION

The Commission's opinion awarding the refund was based on two grounds.

### A. *First Ground*

Invoking the emergency power statutes,[2] the Commission said that it had "concluded that it properly could interpret Code §§ 58-603 and 58-661 (gross receipts taxes) to relieve gas companies of payment of such taxes upon receipts derived from emergency transfers of gas by a utility with gas to spare to another such utility with insufficient gas to meet the requirements of its customers." Borrowing from the language of § 56-250, the Commission interpreted that statute "particularly" to vest it with "the broadest discretion . . . to authorize [a] public utility to take such actions as . . . will minimize

---

[2] § **56-249.1. Commission may require transfer of gas, water or electricity by one utility to another; compensation.**—The Commission may require a public utility to transfer to another public utility of like business, gas, water or electricity, whenever the public health, welfare or safety shall be found to so require; provided, however, that the transferring public utility shall be compensated, at a rate fixed by the Commission, for all such deliveries by the receiving public utility.

§ **56-250. Commission may authorize action by public utility in time of emergency or shortage; plans.**—(1) Whenever it shall appear by satisfactory evidence that any public utility furnishing in this State power, heat, light or water cannot supply all of its customers the usual requirements of each by reason of strikes, accidents, want of fuel, or for any other reason, the Commission may authorize such public utility to take such action as, in the opinion of the Commission, will minimize adverse impact on the public health and safety and facilitate restoration of normal service to all customers at the earliest time practicable.

(2) To facilitate implementation of this section, the Commission may require any such public utility to file, as a part of the rules and regulations referred to in § 56-236, its plan for curtailment of service in such a condition of emergency or shortage. Such plans shall be considered and shall take effect in the manner provided in this chapter for the schedules of rates and charges and rules and regulations of public utilities.

adverse impact on the public health and safety." The opinion further explained that the Commission had determined that emergency spot sales "were . . . unrelated to the exercise of franchise rights . . . and, therefore, [revenues from such sales] were distinguishable from gross receipts expected to be taxed under §§ 58-603 and 58-661."

### B. *Second Ground*

Noting WGL's contention "that the doctrine of 'equitable estoppel' controls", the Commission found that WGL had transferred "gas during the emergency period relying on representations made by members of our staff (a reliance justifiably established by years of prior dealings) that the transfers were not to be assessed". This finding was based upon Hughitt's testimony that, but for the Commission's representations, "[t]he negotiated rates [on the sales at issue] would have been increased by an amount equal to the gross receipts tax or the gas would have been sold in some state other than Virginia where gross receipts taxes were not applicable." Characterizing that testimony as "not contradicted", the Commission held that "we find it absolutely incumbent to refund the taxes here in issue."

## III. THE COMMISSION'S ADMINISTRATIVE POWER TO CONSTRUE TAX STATUTES

### A. *Tax Statutes*

■ Nothing in § 58-603 "permits, or requires, the assessment of only a portion of the gross receipts derived from distributive sales. . . . [or] purports to limit the tax to revenue from sales for a specific use. To the contrary, . . . § 58-603 imposes the tax upon the corporation's gross receipts from *all* sources." *Com. Nat. Res.* v. *Commonwealth,* 219 Va. 529, 536, 248 S.E.2d 791, 795 (1978). Section 58-661 imposes a Valuation Fund tax upon "gross receipts from business done within the State". The only limitation upon the taxable base defined in these tax statutes is that the receipts be derived from business conducted in Virginia.

### B. *Emergency Powers Statutes*

The emergency power statutes invoked by the Commission do not authorize it to construe and apply the tax statutes otherwise. Section 56-249.1 merely authorizes the Commission to require a public utility to make emergency spot sales at prices fixed by the Commis-

sion. Section 56-250, upon which the Commission placed primary reliance, gives the Commission the discretion to authorize a public utility with a gas deficit "to take such action as [the Commission believes] will minimize adverse impact on the public health and safety and facilitate restoration of normal service"; it has no relevance whatever to the Commission's authority over a public utility with a gas surplus.

### C. Spot Sales as Exempt Business

█ Further in support of the first ground of its opinion, the Commission reasoned that emergency spot sales are "unrelated to the exercise of franchise rights" and that revenues from those sales are "distinguishable from gross receipts expected to be taxed under §§ 58-603 and 58-661". Defending this reasoning on brief, the Commission contends that "the question is whether it may lawfully interpret the phrase, 'business done in this State', which appears in both Code §§ 58-607 and 58-661, so as to exclude" emergency spot sales. The Commission argues that "[t]he term 'business' . . . means 'public service business' for which the company is certificated."

We reject that argument. Indeed, in our view § 58-607 reinforces our conclusion that the taxable revenues contemplated by the tax statutes are gross receipts from all sources, for it provides that "[t]he gross receipts . . . subject to taxation shall include those received from incidental operations as well as those derived from the sale of water or heat, light and power." Even if revenues from sales made by one Virginia gas distributor to another are not derived *directly* from business for which the seller is certificated, they are clearly receipts from operations *incidental* to business conducted in this State.

### D. Compromise and Settlement Powers

█ On appeal, WGL also relies on Code § 12.1-15[3] (which was never invoked in the Commission's opinion) as the Commission's

---

[3] In relevant part, this statute reads as follows:

**§ 12.1-15. Power to compromise and settle; power to waive penalties and charge off delinquent taxes, etc.**—The Commission shall have power and authority in any matter, claim, or charge within its jurisdiction, under any provision of law heretofore or hereafter enacted, to compromise or settle any matter, claim, or charge, either by or in a formal proceeding, or informally, whether any proceeding shall have been instituted or not, and the Commission shall have the power and authority to dismiss any proceeding which is pending and in which a

authority to order refund of its payment. The first paragraph of that statute enables the Commission "in any matter . . . within its jurisdiction, under any provision of law . . . to compromise or settle any matter . . . in a formal proceeding or informally". Pointing to that language and the authority granted by § 56-249.1 to fix prices on spot sales, the Commission insists that "the taxing statutes in issue are indeed subject to judicial interpretation by the Commission".

But the power to compromise and settle is not the power to waive and exempt. Moreover, the broad authority granted in the first paragraph of § 12.1-15 must be construed in light of the statute's provisions defining the Commission's power in tax disputes. The fourth paragraph authorizes the Commission "to waive the assessment of any *penalty* or *interest* upon any tax . . . assessed by the Commission" (emphasis added). And, under the fifth paragraph, the Commission can "charge off delinquent taxes", but *only* "when the claims therefor are worthless or cannot be economically collected". While § 12.1-15 may authorize the Commission to compromise or settle a dispute over the amount of tax due under an assessment, it does not empower the Commission to exempt particular receipts from gross receipts taxes.

We find nothing in any of the several statutes cited or elsewhere which supports the Commission's view that it has the authority to waive gross receipts taxes on emergency spot sales. Had the General Assembly intended to grant such authority, it could have done so expressly. It did not, and we cannot accept the strained conclusion that it did so implicitly.

In summary, we hold that the first ground underlying the Commission's opinion is without merit.

---

compromise or settlement is effected without making a formal record of such compromise or settlement, in its sound judicial discretion.

. . . .

The Commission shall have power and authority to waive the assessment of any penalty or interest upon any tax or fee assessed by the Commission, and to abate and exonerate any such penalty or interest, whether heretofore or hereafter assessed, for providential or other good cause shown to the satisfaction of the Commission, or in cases where the collection thereof cannot be economically effected because the cost of collection exceeds the amount recoverable.

The Commission shall have power and authority to charge off delinquent taxes and registration fees on its books when the claims therefor are worthless or cannot be economically collected, and shall notify the State Tax Commissioner and the Comptroller of such action in such detail and at such times as they may require, and shall maintain records which indicate the reason for the charge off for a period of three years.

## IV. THE DOCTRINE OF EQUITABLE ESTOPPEL

In oral argument, as on brief, WGL relied principally upon the doctrine of equitable estoppel. However, counsel for the Commission disavowed the doctrine. The Commonwealth argued that the issue is "not before the Court" because "the Commission's Opinion reveals that it made no decision with respect" thereto. In our view, the only fair import of the opinion is otherwise, and we will address the issue.

### A. *Principles of Law*

■ WGL argues that the Commonwealth is "estopped to withdraw retroactively a revenue ruling given to a specific taxpayer." We have said that "the doctrine of estoppel does not apply to the rights of a State when acting in its sovereign or governmental capacity. This is so because the legislature alone has the authority to dispose of or dispense with such rights." *Main* v. *Department of Highways,* 206 Va. 143, 150, 142 S.E.2d 524, 529 (1965). *See also, McMahon* v. *City of Virginia Beach,* 221 Va. 102, 108, 267 S.E.2d 130, 134 (1980); *Segaloff* v. *City of Newport News,* 209 Va. 259, 261, 163 S.E.2d 135, 137 (1968). *Main* was not a tax case, and we recognize that ours may be a minority view and that the recent trend appears to be to the contrary.[4] *But cf. Automobile Club* v. *Commissioner,* 353 U.S. 180, 183 (1957) ("The doctrine of equitable estoppel is not a bar to the correction by the Commissioner [of Internal Revenue] of a mistake of law.") Without trenching upon precedent and, for purposes of this opinion only, we assume that the doctrine may be applied to the State Corporation Commission in a case such as this.

■ When, as here, the Commission sits as a court, it is required to "observe and administer the common and statute law rules of evidence as observed and administered by the courts". Code § 12.1-30. The rule applicable in this case was stated and the evidentiary

---

[4] "There is growing recognition among the state courts of the healthy principle that a person who relies in good faith on an agency rule should be held harmless from loss if that rule is later held invalid, or is amended.

. . . .

"[T]he state courts quite uniformly accord protection to parties who had relied on an administrative rule that was subsequently amended or repealed. The new rule, of course, may be enforced prospectively; but the courts do not permit it to be applied retrospectively to periods during which the old rule was in effect, if such retrospective application would be detrimental to the interests of persons who had relied on the superseded rule."

1 F. Cooper, *State Administrative Law* 267-68 (1965).

standard defined in *Utica Mutual* v. *National Indemnity,* 210 Va. 769, 773, 173 S.E.2d 855, 858 (1970):

> "It is elementary that the burden rests on the party relying on a waiver or estoppel to prove the essentials of such waiver or estoppel by clear, precise and unequivocal evidence. The evidence must not leave the matter to mere inference or conjecture but must be certain in every particular."

To establish its claim of estoppel, WGL had the burden of proving by "clear, precise and unequivocal evidence" that the contract prices on the five spot sales were fixed in reliance upon the Commission's representations that the sales would not be taxable and that, consequently, WGL suffered a detriment. *See T. . . .* v. *T. . . . ,* 216 Va. 867, 873, 224 S.E.2d 148, 152 (1976).

The Commission's findings will not be disturbed when they are "based upon the application of correct principles of law". *Bralley-Willet* v. *Holtzman Oil,* 216 Va. 888, 891, 223 S.E.2d 892, 895 (1976). The ultimate question, then, is whether the Commission, in making the findings basic to its tacit conclusion that it was estopped to make the assessment on receipts from prior sales, correctly applied the principles of law prescribed in *Utica Mutual.*

### B. *Reliance*

In the Commission's opinion, WGL made the sales "relying on representations made by members of our staff". The telephone call advising WGL that emergency spot sales would not be taxed was made on November 18, 1975, the date of the written contract for the first spot sale. Hughitt testified that "I can't tell you exactly what negotiations went on prior to the time we entered that agreement" but that there "is generally a lapse of a few days" before a contract is signed. Hughitt agreed that the same was true of the sale memorialized by the November 19, 1975 contract. Hence, while it may be true, as Hughitt said, that all five spot sales were made "in compliance with" the functional scheme of the Plan, it is clear that the first two sales were initially negotiated without reliance upon the promise of a tax exemption. And no evidence shows that the negotiated price was renegotiated before the contract documents were signed.

### C. *Detriment*

Hughitt further testified that, but for the Commission's "advice", the contract prices on all five sales "would have been increased by

an amount equal to the gross receipts tax". The Commission accepted that testimony as "not contradicted".

It is true that the Commonwealth introduced no evidence to negate Hughitt's assertion. But the burden rested upon WGL to establish the affirmative by evidence "certain in every particular", leaving nothing to "mere inference or conjecture". The only evidence arguably supportive of Hughitt's assertion were statements in affidavits filed by two purchasing distributors. Those affidavits show merely that gross receipts taxes were not discussed during negotiations; they do not show that WGL reduced its asking price by "an amount equal to the gross receipts tax".

Other facts tend to discredit Hughitt's assertion. WGL made two spot sales in 1977 after the date of the Rogers letter and an unspecified number of spot sales in 1974 preceding adoption of the Plan and the Commission's telephone call. WGL introduced no evidence to show how the prices on these sales, all of which apparently were made under written contracts containing no gross receipts tax clause,[5] compared with prices on the five sales in issue. Other than Hughitt's assertion, nothing before us indicates that the prices received on the assessed sales were lower than those prevailing in the market or that the buyers would have paid more if WGL had asked more.

Applying the appropriate evidentiary rules, we are of opinion WGL failed to carry its burden of proving by clear, precise, and unequivocal evidence that it relied to its detriment upon the Commission's representations. To the extent the Commission's opinion was based upon WGL's claim of equitable estoppel, we hold that the Commission either failed to apply correct principles of law or misapplied those principles.

## V. THE COMMISSION'S JUDICIAL POWER

Finally, WGL maintains that the Commission, acting as a court, "has the authority to apply a changed ruling prospectively and thereby to limit its retroactive impact on taxpayers." WGL reasons that the Rogers letter withdrawing the "earlier advice" changed a former tax ruling and that the Commission, in the exercise of its judicial discretion, had the authority to limit the impact of that change to spot sales made after May 6, 1977. We disagree. We have held that the Commission, acting as an administrative agency, had no authority to grant tax exemptions on spot sales. Consequently, the

---

[5] Such a clause does not appear in any contract for a spot sale consummated before WGL filed its petition below.

"earlier advice" was not a valid tax ruling; the Rogers letter was not a "changed ruling" but, rather, an affirmation of the continuing applicability of the tax statutes; and the Commission had no judicial authority to suspend their application retroactively.

\* \* \* \*

Finding no merit in either ground underlying the Commission's opinion, we will reverse the judgment and enter final judgment for the Commonwealth.

*Reversed and final judgment.*