# CIRCUIT COURT OF THE CITY OF NORFOLK

HBR Properties Norfolk, L.L.C.

v.

JANAF HQ, L.L.C.

November 10, 2009

Case No. CL06-6721

BY JUDGE KAREN J. BURRELL

This case concerns a lease entered into between Plaintiff, HBR Properties Norfolk, L.L.C. ("HBR"), and Defendant, JANAF HQ, L.L.C. ("JANAF"), for property located at the JANAF Shopping Complex in Norfolk, Virginia. HBR's lease began on August 1, 2000, (the "Lease") and is scheduled to terminate on March 23, 2020.

A previous dispute over this lease, concerning HBR's obligation to provide JANAF with financing, resulted in JANAF filing suit in the U.S. District Court for the Eastern District of Virginia. Concurrently, HBR challenged the Common Area Expenses ("CAM") charged as a component of their rent. The litigation was settled in May 2003 by a settlement agreement (the "Agreement") that included an estoppel provision.

The present litigation commenced on December 22, 2006, when HBR filed suit in Norfolk Circuit Court challenging CAM fees from 2001 to 2005. The matter was tried before this Court from March 17 to March 20, 2008. Plaintiff seeks a total of $1,084,610 in damages; Defendant concedes it over-billed Plaintiff in the amount of $230,807.84.

*I. HBR Is Estopped from Asserting Any Claims of Lease Breach or Default Arising Prior to the Date of the Agreement*

A. *The 2003 Litigation*

When the Lease was negotiated in 2000, HBR had no tenant to occupy its premises. JANAF was concerned it would not be able to secure sufficient financing for the premises because of this vacancy and so required HBR venturers Vornado and Starwood Ceruzzi to execute a guaranty obligating them to make a loan to JANAF to cover any resulting deficiency in financing. When JANAF was not able to obtain sufficient financing and could not agree with HBR on the amount of financing HBR was required to provide, JANAF filed suit in the United States District Court for the Eastern District of Virginia ("EDVA").

The EDVA suit was settled in May 2003 by the terms of the Agreement, which required HBR to pay $250,000 to JANAF, dismissed the suit, and voided HBR's loan obligation. Additionally, the Agreement included an estoppel provision that reads:

> By their execution below, HBR and Starwood Ceruzzi hereby certify to JANAF HQ as of the date hereof that (i) the Lease is in full force and effect, (ii) to the best of HBR's and Starwood Ceruzzi's knowledge and belief, no uncured default, event of default, or breach by JANAF HQ or HBR currently exists under the Lease, and (iii) neither HBR nor Starwood Ceruzzi has made any claim against JANAF HQ alleging JANAF HQ's default under the Lease that remains uncured as of the date hereof.

(Def. Ex. 2.) JANAF argues this provision estops HBR from making any claims on the Lease arising prior to the Agreement. HBR retorts that it lacked sufficient knowledge to be so estopped. For the reasons that follow, the Court finds that HBR is estopped from asserting any claims of lease breach or default arising prior to the date of the Agreement.

B. *The Estoppel Provision*

The burden of establishing that an effective estoppel certificate was created within the Agreement rests upon Defendant, who must prove the elements of estoppel by "clear, precise, and unequivocal evidence. The evidence must not leave the matter to mere inference or conjecture but must be

certain in every particular." *Utica Mut. Ins. Co. v. National Indem. Co.*, 210 Va. 769, 773 (1970) (citing *Trayer v. Bristol Parking, Inc.*, 198 Va. 595, 606, 95 S.E.2d 224 (1956)).

An estoppel claim must establish six elements:

> 1. There must have been a representation or concealment of material facts. 2. The representation or concealment must have been with knowledge of the true state of facts, unless the party making it was bound to know the facts, or his ignorance of them was due to gross negligence. 3. The party to whom it was made must have been ignorant of the truth of the matter as to which representation was made. 4. It must have been made with the intention that the other party should act on it; but the place of intent will be supplied by gross and culpable negligence on the party sought to be estopped, if the effect of that negligence is to work a fraud on the party setting up the estoppel. 5. The representation or concealment must be proved to have been the inducement to the action of the other party. 6. The party claiming the estoppel must have been misled to his injury.

*Chesapeake & O. RR. v. Walker*, 100 Va. 69, 91-92 (1902) (quoting 4 Amer. & Eng. Decs. in Equity 268).

As to the first element, representation, there is no dispute that the estoppel provision provided by the Plaintiff was a representation of material facts. In the estoppel provision, HBR represented that no uncured default, event of default, or breach existed under the Lease to the best of its knowledge. The facts underlying this representation were material to JANAF's assent to the Agreement and are material to the case at bar. (Def. Ex. 2, p. 2; 3/20/08, Tr. 973-75.)

As to the third element, knowledge of the party claiming estoppel, there was no evidence presented that Defendant was itself aware of any breach or default on its part.

As to the fourth element, intent, the context of the estoppel provision, its name and its location within a settlement agreement, makes clear that HBR made its representation with the intention that JANAF should act upon it. HBR consented to the terms of the estoppel clause because the Agreement granted HBR relief from a two to five million-dollar loan obligation and disposed of the pending lawsuit, an arrangement that HBR considered a bargain and "jumped at." (3/20/08, Tr. 1011.)

As to the fifth and sixth elements, inducement and injury, William Tyler, who was primarily responsible for negotiating the Agreement for JANAF, testified that the estoppel provision was a critical, negotiated-for provision of the Agreement, and that JANAF could not have obtained sufficient third-party financing without it. (3/20/08, Tr. 972-75.) JANAF would not have agreed to the monetary settlement of the Agreement without the estoppel provision. (3/20/08, Tr. 975, 991-93.) Additionally, JANAF relied upon the income from the HBR lease to support the loan and pay its debt service. (3/20/08, Tr. 975.)

It is the second element of estoppel, knowledge, that is the least clearly demonstrated. Defendant argues that Plaintiff is estopped from making any claims on the Lease that arose prior to the May 15, 2003, settlement date. For Plaintiff to be so estopped, Plaintiff must have possessed knowledge of an "uncured default, event of default, or breach by JANAF HQ" that existed at the time of the Agreement. (Def. Ex. 3 3/19/08.) Alternatively, Plaintiff may be estopped if Plaintiff was bound to know of such a default or breach or if Plaintiff's ignorance of such a default or breach was the result of gross negligence. *Chesapeake & O. RR. v. Walker*, 100 Va. 69, 91-92 (1902) (quoting 4 Amer. & Eng. Decs. in Equity 268).

Defendant does not argue that Plaintiff was actually aware of a default or breach, but only argues that Plaintiff was aware of the nature of past CAM and was aware of Defendant's methods for calculating and charging CAM when Plaintiff agreed to the estoppel provision. (Defendant's Post-Trial Memorandum ("DPTM"), 18.) Thus, Defendant argues that Plaintiff was bound to know of any existing default or breach or that its ignorance of any such default or breach was the result of gross negligence. Because Plaintiff admits it is the successor in interest to the entities who signed the Agreement, the arguments below pertaining to HBR Properties, L.L.C., and Starwood Ceruzzi, L.L.C. ("Starwood") apply with equal force to Plaintiff. (Plaintiff's Post-Trial Memorandum ("PPTM"), 60.)

## C. *Plaintiff Was "Bound" To Know of Any CAM Breaches*

Starwood had the intention, motive, and opportunity to become aware of any errors or breaches in CAM charges prior to their negotiation and signing of the May 15, 2003, Agreement that contained the estoppel provision and thus was bound to know of any breaches by JANAF.

### 1. *Intention To Review CAM Charges*

The evidence established that on February 15, 2002, Art Hooper, Executive Vice President and General Counsel for Starwood (the managing entity for HBR Properties, L.L.C., at the time) sent a letter to Richard Kreman, counsel for JANAF. In this letter, Hooper wrote that he viewed Kreman's letter of February 13, 2002 (Def. Ex. 5 3/19/08) "as an admission by the Landlord that the Tenant has been overcharged on CAM," requested "permission to conduct an audit of CAM Expenses being charged by JANAF," reserved "all rights to claim back any overcharge from Landlord," and instructed his accounting office "not to make additional CAM payments until we can verify the accuracy of the charges." (DPTM 7; Def. Ex. 4 3/19/08.)

Under the circumstances, Starwood clearly believed JANAF had mistakenly provided them with inaccurate figures. (3/20/08, Tr. 1015.) Consequently, in a February 21, 2002 letter from Hooper to Tyler, Hooper instructed Tyler not to utilize an estoppel letter they had previously provided and indicated that Starwood would prepare a new estoppel based on a detailed reconciliation of CAM for the year 2000 and a CAM audit. (Def. Ex. 6 3/19/08.) Tyler understood this letter as a refusal by Starwood to give an estoppel letter until Starwood verified CAM charges; JANAF provided Starwood with the CAM information Hooper requested in his letter of February 21. (3/20/08, Tr. 966.)

### 2. *Motivation To Review CAM Charges*

It is clear from the evidence that Starwood had requested its mortgage consultant, Holliday Fenoglio Fowler, to review the lease underwriting numbers provided in the February 13, 2002, letter from Kreman (Def. Ex. 5) and had asked JANAF for an audit because they "needed to find out what the expenses of the Shopping Center[1] were in order to determine net operating income." (3/20/08, Tr. 1006.) The amount of CAM "profit" was a component of the operating income of the Shopping Center and, thus, was a factor in calculating the size of the loan plaintiff would be obligated to make under the Lease. (3/20/08, Tr. 1009.) As a result, Starwood was compelled to better understand the expenses of the Shopping Center because its estimates of its loan liability, around $2.5 million, were at stark odds with Defendant's, around $4.8 million. (3/20/08, Tr. 1011.)

---

[1] "Shopping Center" as used by the Court in this opinion derives its definition from page 1 of the Lease, section 1(b).

In fact, Hooper testified that the CAM expenses referenced in Kreman's letter of February 13 "concern[ed]" Starwood because they felt their CAM expenses could not have been as high as $191,000, "based on the size of the center and the complexity and our background." (3/20/08, Tr. 1003-04.) In Plaintiff's pre-trial memorandum, which reflects the same claimed CAM overcharges as Plaintiff's Exhibit 70, Plaintiff alleged Defendant overcharged CAM for 2001 in the amount of $186,181.01. Total CAM charges for 2001 were $236,895.25. (Def. Ex. 8 3/19/08.) Of this total, $191,325.00 were billed to HBR Properties throughout 2001 in the form of monthly estimates of Plaintiff's CAM costs. The remaining $45,570.25 was billed as a single lump on March 31, 2002, as the annual adjustment for 2001 reflecting the actual CAM owed by Plaintiff. Based upon these numbers, Plaintiff asserts it owed only $50,714.24 in CAM for 2001, a mere 21% of what it was actually charged and subsequently paid. Thus, Plaintiff asserts that 79% of its CAM bill was an overcharge, that it paid nearly five times more CAM than it owed. The claimed overcharges for the subsequent years are of comparable magnitude. The alleged overcharges for 2002 through 2005 are each in excess of 72% of total CAM billing.

### 3. *Starwood Did Actually Review CAM Charges*

JANAF provided Starwood with the CAM information Hooper had requested in his February 21 letter. (3/20/08, Tr. 966.) Although Hooper states that Starwood was not "concerned so much about what we had been paying for CAM, but we were looking at this from the standpoint of a lender," Starwood still had reason to, and still actually did, review "all CAM billings." (3/20/08, Tr. 1006; Def. Ex. 4.)

Although Plaintiff never performed the audit it had requested of Defendant, Plaintiff received regular CAM reconciliation statements that detail operating expenses, insurance costs, and administrative fees. (Def. Ex. 8, 3/19/08.) Plaintiff did actually review these CAM statements more than one year before signing the Agreement and sustained no objection to the amount of CAM charged, the categories of CAM charged, or to any formulas used for the calculation of CAM. For Plaintiff to have made such reviews without objection leads the Court to conclude that Plaintiff either knew the CAM charges to be correct or should have known that the CAM charges were incorrect but was negligent in its review. This argument is fortified by the fact that Plaintiff claims it was being charged nearly five times as much CAM as it owed, a massive overcharge that should have put Plaintiff on notice that CAM charges were inaccurate.

Because Defendant reasonably relied to its detriment on Plaintiff's representation that it was aware of no breach or default in the Lease, and, because, under these circumstances, Plaintiff should have been aware of any CAM overcharges, defaults, or breaches that were in existence at the time of signing the Agreement, Plaintiff is estopped from asserting any claims of Lease breach or default arising prior to the date of the Agreement.

## II. *Lease Interpretation*

### A. *"Common Area Expenses" Include Expenses of the Shopping Center*

The Lease requires HBR to pay Additional Rent each month in addition to a fixed monthly rent. This Additional Rent is defined as a Pro-Rata Share of the overall expenses incurred by JANAF in operating, maintaining and repairing some portion of the Shopping Center, known as HBR's Common Area Expense Contribution. (Pl. Ex. 1, section 5(d).) In dispute is whether these Common Area Expenses ("CAM") encompass solely those expenditures incurred by JANAF for the benefit of the Common Areas of the Shopping Center, or if CAM includes expenditures incurred for the benefit of the Shopping Center in its entirety.

Both parties agree that the Lease is unambiguous with respect to CAM, but disagree as to what CAM encompasses. The mere fact that the parties disagree about the meaning of Lease language is not evidence that the language is ambiguous. *Pocahontas Mining, L.L.C. v. Jewell Ridge Coal Corp.*, 263 Va. 169, 173, 556 S.E.2d 769, 771 (2002).

HBR argues that the Lease limits their CAM pool to expenses of the Common Areas, noting that section 5(d) introduces the Common Area Expenses as "expenses incurred by Landlord to operate the Shopping Center Common Areas." This wording apparently permits JANAF to bill HBR for expenses of the Common Areas, but makes no mention of expenses of the Shopping Center.

JANAF counters that the Lease permits both expenses of the Shopping Center and expenses of the Common Areas to be included in HBR's CAM pool, citing section 5(e)(ii) of the Lease, which defines "Common Area Expenses" as: "the total costs and expenses incurred by Landlord in operating, maintaining, and repairing the Shopping Center and Common Areas." Upon consideration of each interpretation, the Court agrees with JANAF's interpretation and finds Common Area Expenses to include expenses of both the Common Areas and the Shopping Center.

### 1. *The Language of the Lease*

The Court concurs with both parties that the Lease is unambiguous in its definition of Common Area Expenses. As such, the Court looks to the language of the Lease to determine the intent of the parties. *Foothill Capital Corp. v. East Coast Bldg. Supply Corp.*, 259 B.R. 840, 844 (E.D. Va. 2001) (citing *Bender-Miller Co. v. Thomwood Farms, Inc.*, 211 Va. 585, 588 (1971)). Lease language is given its plain and ordinary meaning. *Id.* (citing *Appalachian Power Co. v. Greater Lynchburg Transit Co.*, 236 Va. 292, 295 (1988)). "Courts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein." *Id.* (citing *Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396 (1984)). Virginia Courts are no less restrained by this "plain meaning" rule when its application produces an apparently onerous result. *Id.* (citing *Dominick v. Vassar*, 235 Va. 295, 300, 367 S.E.2d 487 (1988)). Further, the Court is not unmindful of the fact that Plaintiff and Defendant are sophisticated business entities experienced in the negotiation and formation of contracts. The Court will not assume they meant to use a word other than that they chose to use.

As a contract must be interpreted holistically, sections 5(d) and 5(e)(ii) must be read together along with other relevant components of the Lease to discern the parties' intent. *Berry v. Klinger*, 225 Va. 201, 208, 300 S.E.2d 792 (1983). Section 5(e)(ii) is a definitional subsection, located under 5(e) which reads "[f]or the purposes hereof, the following terms shall have the following meanings." As the parties' disagreement is one of definition, the language of 5(e)(ii), which purports to define "Common Area Expenses," is the language that should be used to determine its definition.

Additionally, the language of 5(d) does not foreclose on the ability of JANAF to charge HBR for Shopping Center expenses nor does it explicitly contradict or overwrite the language of 5(e)(ii). In other words, although the language of 5(d) is not congruent to that of 5(e)(ii), the two sections can be read together logically allowing both to remain intact.

Further, the Court notes that five of the exemplary expenses listed in 5(e)(ii) specify their relevance to Common Areas (e.g. "costs of lighting and other utilities serving the Common Areas"). Such qualifications do not limit the categories of CAM that JANAF may charge because this list of exemplars is commenced by the expression "including without limitation," an expression of enlargement that makes clear there are items includable in the list beyond what is specifically enumerated. *Nextel WIP Lease Corp. v. Saunders*, 276 Va. 509, 518 (2008) (quoting *Federal Election Comm'n v. Mass. Citizens for Life, Inc.*, 769 F.2d 13 (1st Cir. 1985), aff'd, 479 U.S. 238 (1986)). Rather, the

attachment of this qualification to only certain exemplars suggests by contrast that those unqualified exemplars must apply to expenses other than or in addition to those of the Common Areas, such as those of the Shopping Center.

HBR has proffered two incompatible interpretations of section 5(e)(ii)'s language "Shopping Center and Common Areas." During his deposition, Goodman testified that the "and" was ambiguous, that he was unsure whether it was intentional or unintentional, and that it could have been the result of a drafting error. (3/19/09, Tr. 616-18.) At trial, Goodman testified that his deposition testimony was the result of his "thinking within the box," and that only after reading leases of JANAF strip center tenants and thinking "outside the box" was he able to give meaning to the expression. *Id.* His interpretation at trial was that the "and" was a restrictive term that caused the expression to mean that CAM included only expenses of "Common Areas *within* the Shopping Center." *Id.* The Court finds Goodman's argument unpersuasive.

To accept HBR's reasoning would require the Court to rewrite the Lease, to construe the Lease in spite of its wording, or to discard the words the parties themselves chose to use, something the Court cannot do. As previously stated, the Court must construe the contract as it is written and must determine the intention of the parties as expressed by their chosen language. The meaning of the contested "and" is readily understood given its context. A clear and unambiguous reading of the Lease is that "the total costs and expenses incurred by Landlord in operating, maintaining, and repairing the Shopping Center and Common Areas" includes expenses related to both the Shopping Center and the Common Areas.

### 2. *Parol Evidence*

Although the Court finds the Lease to be unambiguous in its definition of CAM and therefore need not resort to parol evidence to glean the intention of the parties, the Court would conclude the same if the contract were deemed to be ambiguous and the Court considered the parol evidence presented at trial. *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 632, 561 S.E.2d 663, 667-68 (2002).

The evidence established that the Lease came into being following HBR's purchase of a two million dollar option to assume a lease between Hechinger and JANAF and the exercise of this option was conditioned upon HBR having a retailer who would occupy the leased premises. (3/20/08, Tr. 945-46.) HBR failed to procure a retailer and stood to forfeit its two million dollar investment if it could not negotiate a new lease with JANAF. *Id.* As

the Hechinger lease was not favorable to JANAF, it took this opportunity to obtain a more fruitful lease. *Id.* William Tyler, who negotiated the Lease on behalf of JANAF, and Art Hooper, who negotiated the Lease on behalf of HBR, both testified that JANAF was in a position of superior bargaining power. *Id.* (3/19/08, Tr. 828.) Credible evidence established that, with their superior power, JANAF specifically negotiated for HBR to pay expenses for both Common Areas and the Shopping Center. (3/20/08, Tr. 953.)

Additionally, Hooper testified that he had no "present recollection" of what types of expenses were includable under the Lease, that the definition of Shopping Center expenses was not addressed in any manner during the 2003 guarantee litigation, and that there was no question that HBR was being billed for and was paying Shopping Center expenses prior to the 2003 litigation. (3/20/2008, Tr. 1013, 1016-17.) These three pieces of testimony suggest that Hooper's knowledge that HBR was being charged Shopping Center expenses predates the 2003 litigation, derived either from his involvement in negotiations or from his pre-2003 familiarity with the Lease terms. Despite Hooper's knowledge, HBR made no challenge to Shopping Center expenses prior to signing the estoppel agreement, which suggests they did not deem them improper.

Finally, prior to signing the estoppel agreement, HBR received and reviewed CAM reconciliation statements that specifically delineated items such as building office rent, painting and decorating, and general maintenance: items which were readily identified by HBR's expert, Howard Goodman, as expenditures that do not apply to Common Areas. (2/18/2008, Tr. 544-45.) HBR's failure to protest these items prior to signing the estoppel agreement suggests HBR did not deem Shopping Center expenses improper.

In light of the foregoing, the Court finds that "Common Area Expenses," as defined in the Lease, include expenses related to both the Shopping Center and the Common Areas.

## B. *Overcharges*

All figures given below include the related 15% administrative fee where it applies. Unless otherwise noted, adjustments are made only for the years 2005, 2004, and a pro-rated amount for 2003 starting after the May 15th estoppel agreement.

1. *Personnel Expenses*

To the extent that a JANAF employee was working for the sake of any building not a part of the Shopping Center, a portion of that employee's salary should be deducted from HBR's CAM pool. (3/19/08, Tr. 776-78, 785-86.) Payroll taxes and group insurance costs should be reduced proportionately to those salary reductions. (3/19/08, Tr. 778; Pl. Ex. 72, note 17.)

a. *Ann Arbor Employees*

Undisputed evidence showed that Pat Cookingham, Debra Kern, and Ken Possinelli were all corporate employees of McKinley Commercial, Inc., JANAF's managing entity, ("McKinley") who did not work for the benefit of the Shopping Center; the portions of their personnel expenses included in HBR's CAM pool should be reduced accordingly. (3/19/08, Tr. 800-03.)

b. *Florida Properties*

Clearly, several McKinley employees performed work for both the JANAF and Florida shopping centers. Donald LaBonte and O'Brien spent 10 to 20% of their 2001 to 2003 working hours managing two shopping centers in Florida. (3/17/08, Tr. 264-65.) When LaBonte became the onsite supervisor for these Florida shopping centers in late 2003, O'Brien continued her relationship with those properties as LaBonte's supervisor; O'Brien visited each shopping center once a quarter. (3/17/08, Tr. 139.)

The Court finds that approximately 15% of O'Brien's payroll from 2001 to 2005 and 15% of LaBonte's payroll from 2001 to 2003 was incurred for the Florida properties. (3/18/08, Tr. 548-51; Pl. Ex. 72, notes 6, 15.) One hundred percent of LaBonte's payroll from 2004 to 2005 is attributable to the Florida shopping centers. (3/19/08, Tr. 800-03; 3/18/08, Tr. 551.)

Further, the Court finds that accountant Karen Banks performed accounting and tenant coordination work exclusively for the Florida shopping centers and other excluded buildings in 2001, 2002, 2004, and 2005. (3/18/08, Tr. 337; 3/18/08, Tr. 550; Pl. Ex. 8.)

c. *Montgomery Ward, Shops, the Office Building, and Outparcels*

Convincing evidence proved that O'Brien regularly and frequently inspected the premises of Shops at JANAF ("Shops") and the JANAF Office Building ("Office Building"). (3/17/08, Tr. 138-39.) O'Brien also advertised

for the entire JANAF shopping complex, coordinated and monitored tenant construction (comprising approximately 10% of her working time), monitored tenant rent, oversaw budgeting for the complex's Merchant Association, oversaw maintenance of pump stations 1 and 2, and worked on "tenant problems" associated with the interior of the Office Building. (3/17/08, Tr. 140-46; 3/18/08, Tr. 550.) Additionally, the Court finds that O'Brien managed 900,000 square feet of property at JANAF (nearly 350,000 square feet in excess of the Shopping Center's 551,795), and her entire salary was included within HBR's CAM pool. (3/19/08, Tr. 662-63.)

The Court concludes, as argued by the Plaintiff, that O'Brien's salary should be further reduced by the amount her salary, as included in HBR's CAM pool, exceeds her salary as indicated on her W-2 forms. (3/19/08, Tr. 639-40; Pl. Ex. 72, note 18.)

Credible evidence shows that Marangoni, another McKinley employee, prepared the budgets and maintained the general ledgers and rent receipts for the entire JANAF shopping complex, including Outparcels and other buildings excluded from the Shopping Center. (3/17/08, Tr. 147-48, Pl. Ex. 8.)

The Court finds that maintenance personnel routinely returned shopping carts found on the Outparcels and collected trash found near the Library and Montgomery Ward. (3/17/08, Tr. 196-97; 3/17/08, Tr. 241.) In the Office Building, maintenance personnel performed "typical maintenance" on a daily basis, including repairs and painting. (3/17/08, Tr. 250-52.)

Further, credible evidence establishes that George Moore, Senior Maintenance Technician for JANAF, changed A/C filters and did plumbing for the Office Building. (3/17/08, Tr. 101-02, 112-13, 119.) Moore spent about two hours per day working in the Office Building. (3/17/08, Tr. 250-52.) JANAF's Office Building lease suggests that 50% of a maintenance worker's time would be spent at the Office Building. (Pl. Ex. 37, § 3(e), at p. 3.) Additionally, Moore performed work for the Outparcels, Shops, and the JANAF Executive Building including pothole repairs, line striping, and trash and cart collection. (3/17/08, Tr. 107-10.) Moore spent two to three-and-a-half hours each day (out of eight hours) working for the benefit of Shops and the Office Building. (3/17/08, Tr. 123-24.)

### d. *Payroll Processing Fee*

The payroll processing fee included in HBR's CAM pool is not prescribed nor permitted in the Lease and the Court deems it to be a duplicative charge.

e. *Total*

For the improper inclusion of certain personnel expenses into HBR's CAM pool, HBR is due $241,199.44.

2. *Excluded Parcels in HBR's CAM Pool*

a. *Excluded Parcels*

The Court finds that, although the Office Building, the Library, Montgomery Ward, Shops, and JANAF Outparcels were excluded from the Shopping Center by the Lease, expenditures for the benefit of these buildings were improperly included in HBR's CAM pool.

According to the Lease, HBR's Building GLA at the Commencement Date is identified as 144,000 square feet, and its Pro-Rata Share as 23.8%. (Def. Ex. 8.) The Court arrives at nearly the same number, 24.1%, using 598,105 as the Shopping Center GLA (HBR/Vornado's 144,000 plus the Strip Center tenants' 454,105). (Pl. Ex. 2.) HBR's CAM Recovery Invoices for 2001 and 2002 both also use 24.1% as HBR's Pro-Rata Share. (Def. Ex. 8, Pl. Ex. 26.) Clearly neither the Office Building, nor the Library, nor Shops (which later took the place of Montgomery Ward), nor Outparcels were intended to be part of the defined Shopping Center at the inception of the lease. The inclusion of these properties would have resulted in a much greater Shopping Center GLA.

The Shopping Center GLA decreased for the years 2003-2005 to 551,795 square feet, leaving HBR with a Pro-Rata Share of 26.1%, as reflected in HBR's CAM Recovery Invoices for those years. (Pl. Ex. 23, 24, 25.) Clearly, this new GLA included only the Strip Center and HBR's building.

JANAF acknowledged at trial that the Office Building is not part of the Shopping Center and HBR is not responsible for paying for any expenses in connection with the Office Building, Montgomery Wards, Shop, or Outparcels. (3/18/09, Tr. 441; 3/18/08, Tr. 442.)

Because the Office Building, the Library, Montgomery Ward, Shops, and Outparcels are excluded from the Shopping Center by the Lease, expenditures made by JANAF for the benefit of these buildings should not have been included in HBR's CAM pool.

### b. *HBR's CAM Pool*

The Court finds that, despite the exclusion of Shops at JANAF from the Shopping Center GLA, expenditures for the benefit of Shops were improperly included in HBR's CAM pool in 2004 and 2005. (3/19/2008, Tr. 398-99, 798-99.) Also, expenditures for the benefit of the Office Building were improperly included in HBR's CAM pool. (3/19/08, Tr. 697-99; Pl. Ex. 23-26, 38; Def. Ex. 8.) Further, convincing evidence demonstrated that expenses for the benefit of the Library were included in HBR's CAM pool. (3/18/08, Tr. 414-16; Pl. Ex. 23-26, 40; Def. Ex. 8.)

### c. *Amount Due*

Expenditures for the benefit of excluded parcels were included within HBR's CAM pool; thus, HBR is due $70,170.11. (Pl. Ex. 72.)

### 3. *Insurance*

### a. *Excluded Policies*

The Court finds and JANAF does not dispute that neither tenant discrimination insurance nor boiler insurance should be billed to HBR as insurance necessary to the Shopping Center. (3/18/08, Tr. 470-73; 3/19/08, 723-24, 727; 3/18/08, Tr. 519-22.) In fact, the evidence presented at trial was that tenant discrimination insurance does not tend to apply to commercial tenants and the Shopping Center did not possess the sort of hardware that would normally be covered by boiler insurance. (3/18/08, Tr. 470-73.)

The Court finds that "directors and officers liability," fire, casualty, and property liability insurance benefited the Shopping Center and thus were properly included in HBR's CAM pool.

### b. *Excluded Parcels*

Credible evidence established that HBR was improperly billed for liability insurance premiums covering an excessive GLA. Liability insurance coverage included in HBR's CAM pool encompassed the GLA of the entire JANAF complex. (3/18/08, Tr. 520, 523; 3/19/08, Tr. 817.) Additionally, liability insurance coverage included the GLA of HBR's building, duplicative coverage because HBR was required by the Lease to provide liability insurance for its own premises and was required to indemnify the landlord for

any losses sustained as a result of a claim on HBR's property. (3/18/08, Tr. 523, 656-57; 3/18/08, Tr. 474-75.) Finally, the insurance policy included the GLA of property that had been sold to Wal-Mart and thus was no longer part of the Shopping Center. (3/18/08, Tr. 525.)

For the cost of insurance policies not necessary for the Shopping Center and for liability insurance premiums purchased for non-Shopping Center buildings and HBR's building, HBR is due $102,705.81. (Pl. Ex. 72, note 12; DPTM, 56.)

### 4. *Storm Water Fees*

The Court finds that JANAF incorrectly billed storm water fees directly to HBR in addition to billing HBR for a portion of the entire Shopping Center's storm water fees. (3/17/08, Tr. 191-92.) For improperly billed storm water fees, the Court finds HBR is due $40,543.01. (Pl. Ex. 72.)

### 5. *Pump Stations*

Convincing evidence established that pump station # 2 served only tenants excluded from the defined Shopping Center, Pier One, Olive Garden, and Popeye's, and pump station # 1 served only one building within the Shopping Center, HBR's premises. (3/17/2008, Tr. 144-46, 192; Pl. Ex. 2.) Because HBR is only liable for CAM expenses applicable to the Shopping Center, HBR should not have been billed expenses related to pump station # 2. As HBR was vacant from 2001 to 2005 and produced no sewerage those years, HBR should not have been billed for the tenant sewage moved through pump station # 1.

HBR is responsible for repairs and replacements of pump station # 1, as Common Area Expenses according to the Lease, but is due an adjustment to the extent pump station # 1 benefited Shops and Outparcels. (Pl. Ex. 1, p. 9.)

HBR is due $8,178.93 for pump station # 2. HBR is due $24,627.80 for pump station # 1. (Pl. Ex. 72.)

### 6. *Security Expenses*

The Court finds that JANAF's security forces patrolled the entirety of the JANAF shopping complex, beyond the bounds of the Shopping Center. (3/17/08, Tr. 96-97; 3/19/08, Tr. 692; 3/19/08, Tr. 670-71; Pl. Ex. 13, p. 4.)

As discussed above, expenses for the benefit of the Office Building, the Library, Shops, or Outparcels should not have been included in HBR's CAM pool. Because security expenditures benefited these excluded buildings and

because HBR's pro rata share of security costs did not take into consideration the square footage of these buildings, HBR was over-billed for security services and is owed $48,657.74. (Pl. Ex. 72.)

### 7. Office Building Rent

The Lease provides that JANAF may include in HBR's CAM pool "administrative and overhead costs equal to fifteen percent (15%) of the foregoing Common Area Expenses." (Pl. Ex. 1, p.9-10.) The items that precede this provision include "the total costs and expenses incurred by Landlord in operating, maintaining, and repairing the Shopping Center and Common Areas, including without limitation [ . . . ] the cost of personnel and management to implement all of the foregoing."

The Court finds these provisions permit JANAF to include within HBR's CAM pool both the costs of office rent and a 15% administrative fee.

However, because the office building rent benefited non-Shopping Center buildings, HBR is due $12,401.60. (Pl. Ex. 72.)

### 8. Other

Membership dues, painting and decorating, and general maintenance for the benefit of the Office Building, the Library, Shops, and Outparcels were improperly included in HBR's CAM pool. For these charges, HBR is due $10,881.85. (Pl. Ex. 72.)

### Conclusion

For the reasons stated, the Court finds for the Plaintiff in the amount of $559,366.29.